**PACIFIC INLAND TARIFF BUREAU et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).**

**No. 622.**

District Court, W. D. Washington, N. D.

June 10, 1943.

John M. Hickson, of Portland, Or., and H. C. Brodie, of Olympia, Wash., for plaintiffs.

Robert L. Pierce, Sp. Asst. to Atty. Gen., and J. Charles Dennis, U. S. Atty., and G. D. Hile, Asst. U. S. Atty., both of Seattle, Wash., for defendant United States.

Daniel W. Knowlton and Nelson Thomas, both of Washington, D. C., for intervening defendant Interstate Commerce Commission.

Elmer B. Collins, of Omaha, Neb., and F. T. Merritt, of Seattle, Wash., for intervening defendant Railroads.

Before HANEY, Circuit Judge, and BOWEN and BLACK, District Judges.

BOWEN, District Judge.

This is an action by plaintiffs, a motor carrier freight traffic bureau and a motor

common carrier of interstate freight, to enjoin and set aside an order of the Interstate Commerce Commission of October 13, 1941, refusing to set aside certain newly promulgated railroad rates. The United States and the Commission have answered, and a number of railroads which participated in promulgating the questioned rates have intervened as defendants.

One of such rates promulgated in schedules filed June 15, 1939, is described in I. & S. No. 4648 as a carload all-commodity rate on freight in general, subject to some exceptions, moving from groups D to N western origins to West Coast points. The others of such rates promulgated in schedules filed July 1, 1939, and later, are described in I. & S. No. 4670 as all-rail, related carload all-commodity rates on like traffic from Chicago and other points grouped therewith to Salt Lake City and other Utah destinations. Upon protest from certain motor truck and commercial interests the application of the rates was by Commission order suspended in the respective I. & S. proceedings until January 15 and February 1, 1940, and the railroads voluntarily further suspended the rates until May 15, 1940. The two I. & S. proceedings (4648 and 4670) were by the Commission considered together.

By its report of May 7, 1940 (All Freight to Pacific Coast, 238 I.C.C. 327), the Commission found upon the limited record then before it that the rates had not been shown to be unlawful, although in pursuance of its duty to ascertain the effect of the proposed rates upon the revenues of the promulgating carriers, upon other railroad and motor carrier rates, upon costs borne by individual shippers and receivers of freight and upon expeditious transportation services, the Commission continued its investigation with a view to making such orders and taking such further action as the facts should warrant, but owing to expiration of its power to further suspend, the Commission on May 7, 1940, vacated its previous order of suspension. The proposed rates became effective on May 15, 1940.

Thereafter further testimony was taken and additional hearings were had, and on October 13, 1941, the Commission made its final report (All Freight to Pacific Coast, 248 I.C.C. 73) affirming the finding in its report of May 7, 1940, and accordingly entered its final order discontinuing the investigation, thus leaving in effect the new rates which already had gone into effect on May 15, 1940.

Plaintiffs contend that the Commission did not make sufficient or valid findings of fact in that they are in negative form, and no just and reasonable basis for all-commodity rate classification was shown as required by Section 1(6) of the Interstate Commerce Act, 49 U.S.C.A. § 1(6); that such findings as were made are not supported by the evidence, do not support the conclusions reached and are contrary to law for the alleged reason that there was no affirmative proof by carriers to support the findings as required by the burden of proof rule assertedly imposed by law upon the carriers; that the findings and order are discriminating and prejudicial to plaintiffs' and others' interests under Sections 2 and 3 of the Act, 49 U.S.C.A. §§ 2, 3, and are directly in conflict with other decisions of the Commission on identical facts and with Supreme Court decisions; and that the Commission misconceived or misconstrued and exceeded its own powers under Section 1(6) of the Act and usurped those of Congress by exercising the Commission's discretion as to what extent violations of the Interstate Commerce Act may be sanctioned.

Defendants defend the sufficiency and validity of the findings, conclusions and order of the Commission, and assert that they are supported by the proof made, that under the law as it was when the new rates making a *change*, and not an *increase*, in existing rates went into effect the burden of proof was on protestants to show illegality, and not on the carriers to prove legality, of the new rates, and that, since the new rates merely represented changes in the form of reductions and not increases in existing rates, as to which changes under such applicable law the burden was on protestants to prove unlawfulness, the Commission's finding that the rates were not shown to be unlawful was sufficient.

Although in the absence here of a transcript of the evidence before the Commission, the plaintiffs cannot attack the factual basis of the Commission's findings (Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Lubetich v. United States, D.C., 39 F.Supp. 780, affirmed 315 U.S. 57, 62 S.Ct. 449, 86 L. Ed. 677, we deem it appropriate to here quote from and comment upon certain pertinent parts of the Commission's reports. In

the report of May 7, 1940 (238 I.C.C. 327, at pages 331, 332), it was stated:

"The protestant trucking interests object to all-commodity rates on the ground that they are unsound and point out that the rail carriers hold the same view, except where they face competition. Doubt may be expressed as to this, in the light of the showing that such rates as are proposed are necessary to permit a free flow of commerce as trade is now conducted, and the widespread and increasing use of such rate system. The trucking interests urge that the proposed rates show a disregard for reasonable freight classifications; would afford large shippers and large communities undue advantages over small ones; are lower than competition justifies; would lead to reductions in truck rates; would tend to break down the general rate structure; and would be out of consonance with section 202 of the Motor Carrier Act [49 U.S.C.A. § 302]. It appears, however, that important motor carriers maintain similar rate bases over wide areas, with minima either adapted to the sizes of their vehicles or larger, based upon competitive rail rates. There is a close analogy between carload all-commodity rates and container rates; the differences are chiefly those of size. We are not persuaded by this showing that the requirements of law as to classification are contravened.

"On the limited record before us, we find that the proposed rates are not shown to be unlawful."

Elsewhere in that report it is shown that all-commodity rates, although an innovation in domestic transcontinental traffic, "have been maintained for years on export traffic to meet direct sailings from the Atlantic ports to the Orient" (page 328), that for several years railroads to meet truck competition have maintained all-commodity rates on shipments from and to many points east of the Rocky Mountains (page 328), that large quantities of miscellaneous package goods now move from Mountain-Pacific territory to Pacific Coast states at combination rail-truck rates much below present transcontinental less-than-carload rates (page 329), that the Maritime Commission has found justified as to shipments from New York to Pacific Coast ports with certain exceptions the establishment by intercoastal steamship lines of less-than-carload commodity rates and any-quantity rates to the level of carload rates (page 330), and that shippers expect to use the rates here in question which are needed to meet the changing conditions of merchandising (page 330).

In the Commission's report of October 13, 1941 (248 I.C.C. 73, at page 74), we find the following analysis:

"All-commodity rates and their application.—As explained in the prior report (238 I.C.C. 327 et seq.), the all-commodity rates are $2.75 from transcontinental groups D to N, inclusive, to Pacific coast terminals, Seattle, Wash., to San Diego, Calif., inclusive, and to interior points, and also for ocean-rail application by way of Gulf ports from eastern steamship piers at New York City to California points; and $2.05 from Chicago and $2.01 from St. Louis, Mo., and points grouped therewith, to Salt Lake City, Utah. The rates stated are in amounts per 100 pounds.

"These all-commodity rates became effective May 15, 1940, and apply on all kinds of freight, with certain exceptions (see note 3 at bottom of page 74), in straight or mixed carloads, minimum 30,000 pounds, subject to rule 24 (follow-lot rule) of the governing western classification, but are not subject to rule 10 (the mixing rule) nor rule 34 (the multiple-car rule), and cars may not be stopped in transit to complete loading nor to partially unload. They do not apply as proportional rates, but they may be used as factors in constructing rates from and to other points.

"Whether the rates may be used from and to all points from and to which they are published depends on the ability of shippers from such points to make up carloads of freight which weigh the required minimum. In the absence of freight of the minimum amount, the available freight may be consolidated with other all-commodity freight upon payment of the applicable rates from and to the billed origins and destinations of the cars. For example, the rates apply to San Diego, but because of the inability of that point to make up the minimum, the freight moves to Los Angeles at the all-commodity rate, and by rail or truck beyond at the applicable rates from Los Angeles to San Diego on the commodity and for the quantity moved. The same situation applies at other origins and destinations.

"Freight customarily shipped under these rates consists mainly of relatively light and bulky manufactured goods, and normally the goods would move in less-than-carload

lots at higher class or commodity rates applicable to the respective articles or mixtures thereof. More than two-thirds of this freight would move on commodity rates which were originally established to meet the competition of intercoastal water lines through the Panama Canal. Shippers testified that they do not ship this class of merchandise in carloads.

"An analysis of 22 representative shipments from Chicago to the Pacific coast in 27 cars between May 24 and July 6, 1940, embracing 1,886 articles of different descriptions and weighing 892,634 pounds, shows that of the total weight, 85.66 percent consisted of articles rated first class and higher in less than carloads and in any quantity; 8.57 percent, second class; 5.11 percent, third class; and 0.66 percent, fourth class. The weighted average of all of it was 99.2 percent of first class."

At page 77 of 248 I.C.C., we note that as to the—"Purpose of the all-commodity rates.—The respondents produced testimony to the effect that these rates were established to meet the competition of lower rates by rail-truck, motor carrier by highway, and water lines; and to modernize the rail rates in harmony with the present-day methods of merchandising."

After discussing various factors of competition among rail, water and truck carriers on pages 77 and 78, stating on page 78 that "Motor carriers by highway maintain all-motor rates lower than by rail from Chicago to Los Angeles and San Francisco", and citing specific instances and other data in connection therewith, the Commission on page 79 of 248 I.C.C. set forth the following factual conditions:

"Position of shippers and motor carriers and the effect of the all-commodity rates upon the costs borne by individual shippers. —With but few exceptions the retail shippers, large and small, favor the all-commodity rates. Use of these rates has grown until the rates have had an important effect upon the method of merchandising. The trend is now toward small units of sale and rapid turnovers. The former method of buying merchandise in large quantities, in straight carloads, and storing until used, or shipping to wholesalers or jobbers and distributing locally, has been largely discontinued as being uneconomical.

"The practice of consolidating and shipping as carloads has generally proved satisfactory to western consignees, and is considered indispensable by many. Among the benefits claimed for this method of shipping are that the service is faster, the goods arrive in better condition, and fewer claims are necessary; that shipments made through forwarders can be easily traced; that shippers are given advance notice of the arrival date of their goods; that the rates are lower and the savings are passed on to the consuming public; and that many articles which formerly could not move because the higher rates resulted in sale prices that the public would not pay now move under the all-commodity rates."

The Commission then discussed the "few exceptions" (few instances) of shipper objections and explained why it concluded on page 80 that " * * * it does not appear that the individual shippers are at a disadvantage".

On pages 80 to 83 the effect of all-commodity rates upon the revenues of the carriers applying the rates and upon the rates of other carriers and the factors involved in such effect are fully discussed and considered and the conclusion is fairly reached by the Commission on page 83 that: " * * * From these figures it is apparent that the gain in volume of traffic for the rail lines would about offset the loss resulting from the lower all-commodity rates, and respondents' (the railroads') revenue would not be materially affected. It is obvious, however, that any gain to the rail carriers would result in a corresponding loss for the truck lines."

Vital factors of lawful rate making were considered and tested in this case, and the resulting conclusions of the Commission were stated at page 87:

"In the prior report it is stated that the proposed rates appear to be compensatory. No evidence to the contrary was presented at the further hearing. It appears that respondents' revenues will not be reduced, and that the all-commodity rates will not be a burden on other traffic; and the record does not show that they would violate any provision of the Interstate Commerce Act.

"Under the circumstances shown, the finding in the prior report is affirmed. An appropriate order will be entered discontinuing the investigation."

■ These facts and circumstances among others disclosed by those reports, and the findings and reasons therefor contained in the above quoted language of the Commission, convincingly negative the

plaintiffs' claims of improper rate classification and of insufficiency and invalidity of the Commission's findings.

■ Nevertheless, plaintiffs insist there was an insufficiency of the proof upon the issues of validity of the findings and rate base, but if there was, any such failure of proof must be charged to plaintiffs, for under the law in effect when these rates became effective the burden of proof, where as here the proposed rates produce only a change and not an increase in existing rates, was upon plaintiffs to establish illegality, rather than upon the carrier defendants to prove legality, of the proposed rates. 49 U.S.C.A. § 15(7); Anchor Coal Co. v. United States, D. C., 25 F.2d 462, 474. The present provisions of the statute, 49 U.S. C.A. § 15(7), placing upon the carrier the burden of proof to justify a *change* in rates did not take effect until September 18, 1940, which was several months after the rates here in question had gone into effect.

■ It was the province of the railroads to initiate the rates here attacked and to put them into effect, subject to the power and duty of the Commission upon protest from plaintiffs and others to suspend and investigate the rates. Having so suspended and investigated, and having administratively determined upon the evidence before it that protestants' claim of unjust and unreasonable classification and of forbidden discrimination and prejudice had not been established, the Commission was not required to make detailed specific findings not necessary to support the conclusion reached. The Commission's reports fully discuss and consider the respective contentions of the parties, the evidence before the Commission, and the reasons supporting its conclusion that the rates had not been shown to be unlawful. The nature and scope of the result reached by the Commission required no more. Findings in greater number and detail would, of course, have been called for if the Commission had instead found the rates unjust and unreasonable in rate base classification or undue in shipper discrimination or prejudice.

■ In its experienced judgment applied to factual bases and conclusions which in the nature of the case are sufficiently reasoned and stated, the Commission, considering the competitive and other conditions inherent in the rate making process here, has disagreed with plaintiffs' assertion of unjust discrimination under Section 2 and of undue and unreasonable preference and prejudice under Section 3 of the Act. We think plaintiffs are mistaken in their contention that the Commission's finding and order are directly in conflict with other decisions of the Commission on facts identical with those here. Plaintiff cited no such other decisions, and we know of none, where the competitive conditions in the transportation of all-commodity carloads and the need for all-commodity railroad rates to reasonably meet carrier competition and better accommodate present trends in merchandising were so fully explored in their various relationships as in this case. It was for the Commission to determine upon the evidence before it in this case whether such competitive conditions and merchandising needs and the circumstances attending the related transportation service justified the questioned change in rates, and this court is bound by such fact determination of the Commission. Barringer v. United States, 63 S.Ct. 967, 87 L.Ed. ——, decided May 3, 1943.

■■ After thoroughly considering the evidence and the factual basis for the rate classification before it, the Commission did not under Section 15(1) of the Act find the all-commodity classification "unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions" of the Act. Without such a finding, the Commission could not set aside the rates, and we cannot say there was no rational basis for the Commission's conclusion that the requirements of the law under Sec. 1(6) as to classification were not shown to be contravened, nor can we, under the authority of United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243, relied upon by plaintiffs, or for any other reason, say that the Commission otherwise abused its power, erroneously construed the statute or exceeded constitutional limits. In that situation, this court is by rule of the Supreme Court precluded from interfering with the Commission's order. Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260; Barringer & Co. v. United States, supra.

The plaintiffs' action will, therefore, be dismissed.

HANEY, Circuit Judge, and BLACK, District Judge, concur.