The NEW YORK, NEW HAVEN AND
HARTFORD RAILROAD COMPANY
(Richard Joyce Smith, William J. Kirk,
and Harry W. Dorigan, Trustees, et al.,
Plaintiffs,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants.

Civ. A. No. 9229.

United States District Court
D. Connecticut.

July 23, 1963.

Thomas P. Hackett, Eugene E. Hunt,
New Haven, Conn., Edward A. Kaier,
Philadelphia, Pa., for plaintiff.

John S. Fessenden, Homer S. Carpen-
ter, Washington, D. C., Robert J. Gillooly,
New Haven, Conn., for defendants.

John H. D. Wigger, Atty., Dept. of
Justice, Washington, D. C., Lee Loeving-
er, Asst. Atty. Gen., Robert C. Zampano,
U. S. Atty., for the United States.

. Robert W. Ginnane, Gen. Counsel, Fritz
R. Kahn, Asst. Gen. Counsel, Interstate
Com. Commission, Washington, D. C., for
I. C. C.

Before SMITH, Circuit Judge,
ANDERSON, Chief District Judge, and
BLUMENFELD, District Judge.

J. JOSEPH SMITH, Circuit Judge.

This is an action under 28 U.S.C.
§§ 1336, 1398, 2284 and 2321–2325,[1] and

---

1. "§ 1336. Interstate Commerce Commis-
sion's orders
"Except as otherwise provided by Act
of Congress, the district courts shall
have jurisdiction of any civil action to
enforce, enjoin, set aside, annul or sus-
pend, in whole or in part, any order of
the Interstate Commerce Commission."
"§ 1398. Interstate Commerce Commis-
sion's orders
"Except as otherwise provided by law,
any civil action to enforce, suspend or

5 U.S.C. § 1009, in which the New York, New Haven and Hartford Railroad Company and its trustees in reorganization and 18 other railroad corporations seek

set aside in whole or in part an order of the Interstate Commerce Commission shall be brought only in the judicial district wherein is the residence or principal office of any of the parties bringing such action."

"**§ 2284.** Three-judge district courts; composition; procedure

"In any action or proceeding required by Act of Congress to be heard and determined by a district court of three judges the composition and procedure of the court, except as otherwise provided by law, shall be as follows:

(1) The district judge to whom the application for injunction or other relief is presented shall constitute one member of such court. On the filing of the application, he shall immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. Such judges shall serve as members of the court to hear and determine the action or proceeding.

(2) If the action involves the enforcement, operation or execution of State statutes or State administrative orders, at least five days notice of the hearing shall be given to the governor and attorney general of the State.

"If the action involves the enforcement, operation or execution of an Act of Congress or an order of any department or agency of the United States, at least five days' notice of the hearing shall be given to the Attorney General of the United States, to the United States attorney for the district, and to such other persons as may be defendants.

"Such notice shall be given by registered mail or by certified mail by the clerk and shall be complete on the mailing thereof.

(3) In any such case in which an application for an interlocutory injunction is made, the district judge to whom the application is made may, at any time, grant a temporary restraining order to prevent irreparable damage. The order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the full court. It shall contain a specific finding, based upon evidence submitted to such judge and identified by reference thereto, that specified irreparable damage will result if the order is not granted.

(4) In any such case the application shall be given precedence and assigned for a hearing at the earliest practicable day. Two judges must concur in granting the application.

(5) Any one of the three judges of the court may perform all functions, conduct all proceedings except the trial, and enter all orders required or permitted by the rules of civil procedure. A single judge shall not appoint a master or order a reference, or hear and determine any application for an interlocutory injunction or motion to vacate the same, or dismiss the action, or enter a summary or final judgment. The action of a single judge shall be reviewable by the full court at any time before final hearing.

A district court of three judges shall, before final hearing, stay any action pending therein to enjoin, suspend or restrain the enforcement or execution of a State statute or order thereunder, whenever it appears that a State court of competent jurisdiction has stayed proceedings under such statute or order pending the determination in such State court of an action to enforce the same. If the action in the State court is not prosecuted diligently and in good faith, the district court of three judges may vacate its stay after hearing upon ten days notice served upon the attorney general of the State."

"**§ 2321.** Procedure generally; process

"The procedure in the district courts in actions to enforce, suspend, enjoin, annul or set aside in whole or in part any order of the Interstate Commerce Commission other than for the payment of money or the collection of fines, penalties and forfeitures, shall be as provided in this chapter.

"The orders, writs, and process of the district courts may, in the cases specified in this section and in the cases and proceedings under sections 20, 23, and 43 of Title 49, run, be served, and be returnable anywhere in the United States."

"**§ 2322.** United States as party

"All actions specified in section 2321 of this title shall be brought by or against the United States."

"**§ 2323.** Duties of Attorney General; intervenors

"The Attorney General shall represent the Government in the actions specified in section 2321 of this title and in actions under sections 20, 23, and 43 of Title 49, in the district courts, and in the Supreme Court of the United States upon appeal from the district courts.

"The Interstate Commerce Commission and any party or parties in interest to the proceeding before the Commission, in

to set aside and annul a report and order of the Interstate Commerce Commission in Investigation and Suspension Docket No. 7131, *All Commodities from New England to Chicago and St. Louis*, in which the Commission, three commissioners dissenting, overruled a report and order of its Division 2, and struck down so-called all-commodity rates on mixed or straight shipments of manufactured articles published by the New Haven and other plaintiffs, finding the rates to be a destructive competitive practice and unjust and unreasonable in violation of section 1(6) of the Interstate Commerce Act, 49 U.S.C. § 1(6), Act of June 18, 1910, c. 309, § 7, 36 Stat. 544. We find the Commission's order unlawful because based on an erroneous interpretation of § 1(6) of the Act and order it set aside and annulled.

The New Haven, faced with loss of traffic to highway carriage and TOFC (trailer on flatcar carriage) which latter it was not in a favorable position to handle extensively because of equipment and clearance difficulties, and plagued with a large tonnage of empty box cars moving West, devised a schedule of reduced boxcar rates on freight in straight or mixed carloads from points in New England territory to Chicago and East St. Louis, Illinois, Gibson and Hammond, Indiana, and St. Louis, Missouri, and filed appropriate tariffs containing these rates. Competing railroads followed suit. Eastern Central Motor Carriers Association, Inc. filed protests and petitions for suspension of the New Haven schedules. Later, 10 of its member carriers joined in the protests. The Commission suspended the schedules and instituted investigations. Subsequently, on petition of the New Haven and certain intervening shippers the suspension was vacated and the rates became effective July 16, 1959, the investigation, however, proceeding to its conclusion December 28, 1961 in the order under review.

The Commission's principal argument in support of its order is the asserted violation of § 1(6) of the Act and its claimed destructive effect on the general rate structure. Under § 1(6), it is "the duty of all common carriers * * * to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or proscribed * * * and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful." Under this provision all carriers subject to the Act publish classifications, in groupings, of all commodities subject to transportation, and tariffs, that is rates per hundred pounds, at which articles in each classification grouping will be carried between any two points. These are

which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party.

"Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Commission, or in any action commenced under the aforesaid sections may intervene in said action at any time after commencement thereof.

"The Attorney General shall not dispose of or discontinue said action or proceeding over the objection of such party or intervenor, who may prosecute, defend, or continue said action or proceeding unaffected by the action or nonaction of the Attorney General therein."

"§ 2324. Stay of Commission's order
"The pendency of an action to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission shall not of itself stay or suspend the operation of the order, but the court may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the action."

"§ 2325. Injunction; three-judge court required
"An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

the class rates. The characteristics of the commodities considered in fixing classification ratings are generally:

1. Shipping weight per cubic foot.
2. Liability to damage.
3. Liability to damage other commodities with which it is transported.
4. Perishability.
5. Liability to spontaneous combustion or explosion.
6. Susceptibility to theft.
7. Value per pound in comparison with other articles.
8. Ease or difficulty in loading or unloading.
9. Stowability.
10. Excessive weight.
11. Excessive length.
12. Care or attention necessary in loading and transporting.
13. Trade conditions.
14. Value of service.
15. Competition with other commodities transported.

The most important are density of the item (light, bulky goods are charged more per 100 pounds as it takes more cars to carry a given tonnage), perishability, difficulty in handling, and value of service. Under the latter, commodities of higher value, whose transportation characteristics were otherwise no different from those of lower value have historically been charged higher rates. The semimonopoly position of the railroads allowed them to do this well into this century. By exacting a premium charge from high-priced commodities, the railroads were enabled to carry low-priced goods at rates not much above the out-of-pocket costs of carriage. Many times, these low rates were necessary as the lower-priced goods could not compete in the market to which they were brought unless the transportation costs were low. Otherwise, they would not move at all, and the traffic was desirable for the railroad as it did contribute something towards overhead. Common carrier and

private trucks have today skimmed off most of the high-rated traffic, leaving the railroads with the unprofitable freight and resulting deficits.

A second type of rate is the commodity rate. This is often described as a "concession to a particular situation" (Commission Brief, p. 14) or in some other terms implying that it is an extraordinary deviation from the normal pattern of class rates. It is a particular price quoted for freight of a particular kind from one place to another. It is lower than the class rates, and set to meet competition (either rail or by other carrier) that would otherwise take away the traffic. It is not a recent innovation, but seems historically to have always been part of the rate structure. See ICC 17th Ann.Rep. pp. 115–16 (1903). Thus, its status as exceptional is questionable. Further, commodity rates appear to have largely superseded the class rates. Only about 1 (one) percent of all railroad carload tonnage in the East moves on class rates.

All-commodity rates (sometimes called all-freight rates) are a natural outgrowth of the rate structure. Since cost of handling is greater, rates on less-than-carload-lots (LCL) are higher per hundred pounds than rates on carload lots. This appears to be true of both class and commodity rates. Shippers thus tried to tender carload lots for shipment. The problem arose when a shipment of mixed articles was tendered. Unless the articles were of the same class, the shipper was at first charged the LCL rate on each item, thus paying high charges for what was actually more like carload service. To remedy this, the mixing rule (Rule 10) was instituted, allowing shipment of a mixed carload at the carload rate and minimum weight of the highest class of article. This concession permitted the growth of the freight forwarders. They operated by collecting LCL shipments and shipping them at the carload rate, making a profit out of the difference between the carload rate they were charged and the LCL rate which was approximately their charge to the original shipper. With the

growth of motor carriers, the railroads began to lose this freight to them—both the LCL shipments and the freight forwarder shipments moved increasingly by truck. The railroads countered with rates for truck bodies, containers (holding any goods), and rates for all-commodities, regardless of their class. The Commission found little difficulty approving this kind of all-commodity rates, especially since they were generally either subject to a mixing rule (e. g., no more than 60% by weight of a shipment may be of one commodity) or were higher than the carload class rates that would otherwise have applied. All-Commodity Rates Between California and Oregon, Washington, 293 ICC 327 (1954); All Freight, Straight Carloads, To and From the South, 258 ICC 579 (1944); All Freight from Butte, Mont., to Spokane, Wash., 257 ICC 291 (1942); All-Freight Rates to Points in Southern Territory, 253 ICC 623 (1942); All Freight to Pacific Coast, 248 ICC 73 (1941), aff'd sub nom. Pacific Inland Tariff Bureau v. United States, 50 F.Supp. 376 (W.D. Wash.1943); All Freight from Chicago and St. Louis to Santa Rosa, N. Mex., 243 ICC 517 (1941); All Freight Between Harlem River, N. Y. and Boston, 234 ICC 673 (1939); All Freight Between St. Louis and Kansas City, 234 ICC 589 (1939); All Freight from Chicago and St. Louis to Birmingham, 226 ICC 455 (1938); Commodities Between Chicago, Ill. and Twin Cities, 226 ICC 356 (1938). All-commodity rates on straight shipments (no mixing rule) thus almost never supplanted the classifications or the commodity rates on carloads then in force, except for the LCL freight, and the railroads themselves at that time had no intention of generally superseding the existing rates. See All Freight, Straight Carloads, To and From the South, 258 ICC 579 (1944). The all-commodity rate was thought of as meeting this particular problem only.

The present rate is an advance only in that it is lower than the existing class and commodity rates, and is intended to apply to the exclusion of those rates on the commodities that it covers. But it is not what the layman would call "all-commodity" either. It excludes anything that cannot be carried in a boxcar—this is obviously a substantial number of things; it is graduated according to minimum weight per car, denser items thus paying less per hundred pounds as has always been true; it excludes perishables, easily damaged goods, explosives, and other such goods whose cost of handling might be extreme; it applies only to freight westward; and there are other exclusions on basis of cost of shipment and handling.

The just and reasonable classification requirement of § 1(6) was adopted in 1910 to give the Commission power to control classification, there being some doubt as to the existence of the power, and its purpose was to protect shippers by controlling the maximum charges for transportation of commodities. This purpose is fulfilled by the maintenance in being of class rates even though competitive conditions lead to the furnishing of service through variously constructed rates at lower charges. The practice of the Commission over the past 21 years, as pointed out by Commissioner Webb in his dissent in the instant case, was consistent with this interpretation, permitting competitively compelled departures from the classification in e. g. All Freight to Pacific Coast, 248 ICC 73, aff. Pacific Inland Tariff Bureau v. United States, 50 F.Supp. 376 (W.D.Wash.1943), and cases cited, supra, We can see no difference in principle between those cases and the one before us and no sound reason for so interpreting § 1(6) as to prohibit such competitively compelled departures from classifications, within the established maxima, absent some other violation of the Act than the mere departure from the classification.

The Commission fears that approval of these rates would be legislation on its part, apparently because it would be the final blow to classification as a control over minimum rates and a further weakening of its role as a "giant handicapper." Having permitted over a long

period exceptional rates which actually move the vast preponderance of this traffic at rates below the class rates, it would seem that it has already effectually legislated or interpreted the modification of what it now claims was the original meaning and purpose of § 1(6). It is strange to find it boggling at this final step of so little effect on traffic actually moving under class rates. In any case, we do not agree that these rates are or ever were a violation of the language or intent of section 1(6). Commodity rates are sufficiently policed under sections 1(5); 2; 3(1); and 15a(3).[2] The record discloses no violation of these sections. It would appear that the Commission here invokes § 1(6) as a means of preserving a basis for the "value of service" concept in ratemaking referred to above, in a desire to hold fast to a past which has already slipped away beyond our reach.

This "value of service" principle was useful in the early years of the Interstate Commerce Act in requiring the more prosperous East to assist in the development of railroads and commercial and agricultural enterprises in the undeveloped West at a time when the existing railroads were powerful monopolies. In his opinion in New York, New Haven & Hartford R. Co. v. United States, 199 F.Supp. 635, 643 (D.C.1961), vacated I. C. C. v. New York, N. H. & H. R. Co., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108, Judge Hincks described the value of service concept as among the "official discriminations, hallowed and encrusted by time and inertia, (which) now pervade the rate structure." The continuing application of the principle is, however, contrary to the letter and spirit of the National Transportation Policy amendment to the Interstate Commerce Act, passed in 1940, 49 U.S.C. note preceding

2. "§ 1, par. (5). "Just and reasonable charges. All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

"§ 2. Special rates and rebates prohibited

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

"§ 3, par. (1). "Undue preferences or prejudices prohibited It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular per-

son, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however*, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

"§ 15a. Fair return for carriers

\* \* \* \* \*

"(3) In a proceeding involving competition between carriers of different modes of transportation subject to this chapter and chapters 8, 12, 13 and 19 of this title, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this chapter and chapters 8, 12, 13 and 19 of this title.

§ 1, which, as its legislative history makes clear, was intended to permit the railroads, no longer effective monopolies, to respond to competition by asserting whatever inherent advantages of cost and service they possessed.

█ The Commission also concludes that the rates at issue constitute a destructive competitive practice under § 15 a(3) of the Interstate Commerce Act. This term was meant to be applied only in the context of competition between different modes of transportation and not for the purpose of supporting the classification provisions of the Act. This phrase, in its proper area of application, was dealt with by this court in New York, New Haven & Hartford R. Co. v. United States, supra, [see also Missouri Pacific R. Co. v. United States, 203 F.Supp. 629, 634 (E.D.Mo.1962)], as follows:

"* * * the differential prohibition was intended to be qualified only when factors other than the normal incidents of fair competition intervened, such as a practice which would destroy a competing mode of transportation by setting rates so low as to be hurtful to the proponent as well as his competitor or so low as to deprive the competitor of the 'inherent advantage' of being the low-cost carrier. The 'inherent advantage' factor and the 'destructive competitive practice' factor were the only two policy factors mentioned in the committee reports. * * *"

██ The finding that the rates will be destructive of competition rests on a basis not entirely clear to us. It would appear rather that they would enable the railroads "to respond to competition by asserting whatever inherent advantages of cost and service they possessed." The rates are admittedly compensatory, exceeding the out-of-pocket costs and in most instances making a substantial contribution to overhead. There is no finding based on evidence that the rates would destroy or impair the inherent advantages of other modes of transportation. The finding of destructive competition is not adequately supported on the present record.

The issues of this case should never have been framed under § 1(6) nor should the meaning of The National Transportation Policy, as referred to in § 15a(3), have been distorted to supplement it.

The order under review is annulled and set aside.