**STATE OF NEW YORK et al., Plaintiffs,**

**v.**

**UNITED STATES of America et al., Defendants.**

**Civ. A. No. 11055.**

United States District Court
W. D. New York.

July 14, 1966.

———◆———

Walter J. Myskowski, Washington, D. C. (Louis J. Lefkowitz, Atty. Gen., Dunton F. Tynan, Asst. Sol. Gen., Ruth Kessler Toch, Acting Sol. Gen., and Matthew A. Tiffany, Asst. Atty. Gen., on the brief), for plaintiff State of New York.

Joseph A. Nicosia, Asst. Corporation Counsel, Buffalo, N. Y. (Anthony Manguso, Corporation Counsel, on the brief), for plaintiff City of Buffalo.

Robert W. Tills, Buffalo, N. Y. (Norman A. Stiller, County Atty., on the brief), for plaintiff Erie County.

Thomas P. McMahon, Buffalo, N. Y., for plaintiff Buffalo Industrial Progress Council.

Leonard S. Goodman, Asst. General Counsel, Interstate Commerce Commission, Washington, D. C. (Edwin M. Zimmerman, Acting Asst. Atty. Gen., John H. D. Wigger, Attorney, Department of Justice, John T. Curtin, U. S. Atty., Robert W. Ginnane, General Counsel, Interstate Commerce Commission, on the brief), for defendants United States of America and Interstate Commerce Commission.

D. M. Tolmie, Philadelphia, Pa. (R. J. Murphy, Chicago, Ill., T. L. Samuel, Baltimore, Md., and Ellsworth A. Van Graafeiland, Rochester, N. Y., on the brief), for railroads intervening as defendants.

Eugene T. Liipfert, Washington, D. C. (Walter E. Alessandroni, Atty. Gen. of Pennsylvania, Edward Friedman, Deputy Atty. Gen., Joseph Martin Gelman, Sp. Asst. Atty. Gen., and Clarence R. Runals, Niagara Falls, N. Y., on the brief), for Commonwealth of Pennsylvania, Port Authority of Allegheny County, Regional Industrial Development Corporation of Southwestern Pennsylvania, and Bay State Milling Company, Inc., intervening defendants.

Before FRIENDLY, Circuit Judge, and BURKE and HENDERSON, District Judges.

FRIENDLY, Circuit Judge:

This action by the State of New York, the County of Erie, the City of Buffalo, and the Buffalo Industrial Progress Council puts in question the validity of a report and order of the Interstate Commerce Commission ruling that reduced rates initiated by certain railroads from Pittsburgh to nine destinations in trunkline territory were just and reasonable, and granting fourth section relief as to two such destinations. Fully recognizing the seriousness of the case to the plaintiffs, and appreciating the earnestness of the arguments by their able counsel, we are unable to find any basis for invalidating the Commission's order.

Buffalo has long enjoyed favorable ex-lake rail rates on grain and grain products to points in trunkline and New England territories—these having been made to enable the rails to compete with all-water routes from the mid-west. See Buffalo Grain Cases, 46 I.C.C. 570 (1917). As a result of these favorable rail rates on grain products and the low lake steamer rates from the grain shipping ports in the mid-west, Buffalo has become the greatest flour milling center of the country; in 1962 it produced almost 28,000,000 hundred-weight of flour, a figure exceeding the combined output of its two closest rivals, Kansas City and Minneapolis.

Some years ago Pittsburgh interests, disturbed by a stand-still in industrial growth and an adverse trend in population, commissioned a study as to that area's economic development. Attention was directed to the possible creation of a milling industry, taking advantage of the low grain rates available for barge movements on the Missouri and Mississippi Rivers and thence up the Ohio. In-

quiries led to a display of interest by a midwestern concern, Bay State Milling Company, which had been marketing in western Pennsylvania bakery flour produced at its Minnesota and Kansas mills. However, Bay State was unwilling to construct a mill to serve only the local market, and investigation showed Pittsburgh was under prohibitive disadvantages in freight rates to the east as compared with Buffalo.[1] As a result of discussions the carriers, while declining to make the full reductions sought, proposed a new schedule of rates from Pittsburgh to nine base destinations in trunkline and two in New England territories. These rates, constructed according to the so-called "McGraham formula" for points in Central Freight Association Territory, under which the rate from Pittsburgh to New York is 60% of the Chicago-New York rate and rates to other destinations are determined by fixed percentages or arbitraries above or below this figure, see Cooperative Grain League Federation Exch. Inc. v. Akron, C. & Y. R. R., 323 I.C.C. 174, 179–82 (1964), considerably reduced the disparity between the competing cities, although in only two instances were Pittsburgh's rates to be lower than Buffalo's.[2]

On the protest of the Buffalo interests, the Interstate Commerce Commission suspended the new Pittsburgh rates pending investigation. In February 1964 Division 2 of the Commission found the proposed rates just and reasonable, and granted the fourth section relief sought by the railroads in connection with rates to two destinations. Grain, Pittsburgh, Pa. to Eastern Base Points, 322 I.C.C. 218. After unsuccessful attempts to secure reconsideration by the Division and review by the full Commission, the New York interests brought this action to set aside the Division's order. In December the Commission reopened the proceeding on its own motion, and this action was stayed by stipulation. After reconsideration by the entire Commission, the rates to the two New England destinations were held not shown to be just and reasonable and were ordered to be canceled; the reasonableness of the rates to the nine trunkline destinations and the grant of fourth section relief were reaffirmed. Grain, Pittsburgh, Pa. to Eastern Base Points, 325 I.C.C. 669 (1965).[3] Plaintiffs thereupon filed amended complaints.

The Commission found that the proposed rates from Pittsburgh to the nine trunkline destinations would in almost every instance exceed "out of pocket costs" as developed by the carriers, which computation the Commission considered proper.[4] The term "out-of-pocket costs" is rather misleading since it includes "much more than a layman might think from the description," New York Central R. R. Co. v. United States, 207 F.Supp. 483, 493 n. 8 (S.D.N.Y.1962), to wit, the "variable" portion of operating expenses, some 80%, plus a return on investment after taxes of 4% on equipment and 2% on road property. See, for a further ex-

1. This was true not only at points where Buffalo had a slight mileage advantage, e. g., 49.5¢ vs. 37.5¢ per cwt. to New York, but even where a substantial mileage advantage lay with Pittsburgh, e. g., 46.5¢ vs. 37.5¢ per cwt. to Baltimore. No traffic moved under the Pittsburgh rates and their propriety had not been challenged.

2. These were rates to Cumberland, Md., only 142 miles from Pittsburgh as compared with 321 from Buffalo, and to Norfolk, Va., 505 miles from Pittsburgh as against 619 from Buffalo. Although Baltimore and Philadelphia are also nearer Pittsburgh than Buffalo, the proposed rates favored the latter city in both instances.

3. Two Commissioners dissented from the disapproval of the rates to New England; two others did not participate.

4. The sole exception was a movement of 70,000 pounds of feed to Albany in covered hopper cars, which the Commission properly did not consider of controlling importance since the rates on all other shipments were compensatory and the record indicated that feed was generally shipped in boxcars rather than hopper cars. Use of protestants' computations would add only one other exception—the same type of movement to Utica.

planation, New York, N. H. & H. R. R. Co. v. United States, 199 F.Supp. 635, 640 & n. 11 (D.Conn.1961), modified sub nom. I. C. C. v. New York, N. H. & H. R. R. Co., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963). In many instances the excess of the proposed rates over out-of-pocket costs was substantial; for the three largest markets the ratio of rates to costs ranged, depending on the type of car and the minimum loading, from 123% to 165% for Baltimore, from 107% to 141% for New York, and from 116% to 154% for Philadelphia.

■ Recognizing as they must that the findings as to costs must be respected as within the Commission's competence, plaintiffs contend these are legally insufficient. They argue that "in the absence of special circumstances, such as competition, rates should return full costs to avoid placing an undue burden on other traffic," and point to evidence that freight traffic as a whole must produce revenues of 139% of out-of-pocket costs in order to enable the railroads to recover their constant costs and the deficits incurred in L.C.L. and passenger traffic and earn a return on their investment. Here, they say, the reduced rates from Pittsburgh not only are not required to meet the competition of another form of carriage but will promote it by substituting a movement of grain to Pittsburgh by barge for the existing movement of midwestern flour by rail; far from enhancing net rail revenues, as when rates are reduced to the out-of-pocket level to attract traffic from a motor or water carrier or to prevent diversion, the railroads will be worse off with the new rates which will permit a milling industry to be created at Pittsburgh than with the old ones that prevented it. They cite as further evidence of the merit of their predictions the unusual intervention of the Waterways Freight Bureau in support of proposed reductions in rail rates.

In contrast to the "lower than necessary" claim frequently made in cases of inter-modal competition, plaintiffs' argument is not that the traffic will move at a rate which makes a larger contribution to fixed costs but that the railroads would be better off if the movement did not occur. Still we will assume in plaintiffs' favor, although without in any way deciding, that—considerations of undue preference and prejudice apart—the Commission could lawfully have disapproved the proposed rates if it found the facts to be as they urge.[5] But we have the gravest doubt whether, in empowering the Commission to proscribe a rate as unduly low, Congress meant to *require* it to examine the wisdom of the proponents of rates yielding more than out-of-pocket costs when there is no threat of injury to competing carriers or consequently of retaliatory action by them, the traffic will not move at higher rates, and the sole substantial claim is that because of effects on other traffic the proponents

---

5. Plaintiffs called attention to the writer's statement in New York Central R.R. Co. v. United States, supra, 207 F.Supp. at 495:

"We do not doubt the power of the Commission, on proper findings, to proscribe as too low a rate which, although covering long term out-of-pocket costs, fails to meet fully distributed ones. Some traffic must pay for the 'non-variable' portion of operating expenses and property taxes and meet the deficits occasioned by traffic (such as the passenger business) that does not pay its way. If the Commission thinks a particular carrier should not haul particular traffic at a rate that will not contribute to such expenses, that is a judgment competent for the Commission to make.

It is no answer that the individual carrier will be better off with the traffic than without it; the Commission must consider the entire transportation system and may, on a proper showing, utilize the minimum rate power to maximize profits for the system, as long as it does not require more than what would be a reasonable maximum rate."

However, this must be read in the context of a situation where some railroads were seeking to establish rate parity for a more distant point to the disadvantage of the net revenue position of other railroads serving nearer points—a problem rather different from the proposal here to provide rates more nearly in accord with mileages from the respective points.

would be better off if the new movement did not occur. Indeed the implication of § 15a(2) which lists "the effect of rates on the movement of traffic" as a factor to which the Commission must give "due consideration" is to the contrary. The situation would seem to be one where, in the absence of evidence that the carriers were reluctantly yielding to improper pressures, the Commission would be warranted, if so advised, in deferring to managerial judgment without further inquiry. See Pig Iron from New York Points to Detroit, 296 I.C.C. 747, 752 (1955).

■ However, we need not decide that question, since both Division 2 and the full Commission considered and rejected plaintiffs' contention that the new rates would disadvantage the railroads which had proposed them. Plaintiffs say the Commission was as wrong on this as the carriers. They are particularly critical of the statement that the quarter of Bay State's grain requirements which Bay State predicted it would move to the Pittsburgh mill by rail, estimated at 250,000 cwt. per annum, was "far in excess of the present flour movement to the Pittsburgh area," 325 I.C.C. at 678; they say with apparent force that this comparison looked only to Bay State's present shipments of 100,000 cwt. of flour into Pittsburgh and ignored other rail movements of flour from Bay State and competing midwestern mills which may be displaced by barge movements of grain to mills at Pittsburgh stimulated by the new rates. They note also that in its estimate of countervailing benefits from the new rates, the Commission failed to consider that flour milled from grain shipped into Pittsburgh by rail would move east not under the new rates but on low transit balances. But the plaintiffs have too onerous a task when they ask us to overrule the combined judgment of the railroads and the "tribunal

appointed by law and informed by experience." Illinois Central R. R. Co. v. I. C. C., 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128 (1907). If fault can be found with the Commission's predictions in some respects, it can also be found with the plaintiffs'. One need hardly go beyond the initial illogic of arguing that the railroads will fare better under the depressed ex-lake rates from Buffalo than with the higher rates proposed from Pittsburgh although, for most destinations, the latter yield considerably higher ratios to out-of-pocket cost. See 322 I.C.C. at 237, 242 Apps. B and D. Since most of the grain milled at Buffalo arrives there by water, all the dire effects predicted from the Pittsburgh rates would thus occur in even greater measure if the Buffalo mills succeeded in displacing an equivalent amount of mid-western flour. Still more adverse consequences would ensue for the railroads if failure to develop a milling industry at Pittsburgh should result in the growth of mills in the large seaport markets to which grain can move by all-water routes. Finally, the new Pittsburgh rates to many destinations show a more favorable ratio to out-of-pocket costs than the proportional rates on which flour moves from Chicago and St. Louis, although, of course, for a shorter haul. See 322 I.C.C. at 237, 243–44, Apps. B and D. In sum the Commission had substantial basis for finding the claim of adverse effect on net revenues to be too speculative to warrant disapproval of rates necessary for the movement of traffic, exceeding out-of-pocket costs, and having no harmful effect on any competing carrier.

As to plaintiffs' other and less important contentions we are also satisfied with the Commission's disposition.

Judgment will be entered dismissing the complaint.