**SEABOARD AIRLINE RAILROAD et al., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Southern Railway Company et al., Defendant-Intervenors.**

**Civ. A. No. 5013.**

United States District Court
E. D. Virginia.
April 3, 1967.

Donal L. Turkal, Richmond, Va. (C. E. Martin, Atlanta, Ga., John F. Smith, Louisville, Ky., A. K. McIntyre, Erwin, Tenn., Phil C. Beverly, Jacksonville, Fla., on brief), for plaintiffs.

Raymond M. Zimmet, Atty., Interstate Commerce Com'n (Robert W. Ginnane, Gen. Counsel, Interstate Commerce Com'n, Donald F. Turner, Asst. Atty. Gen., Claude V. Spratley, Jr., U. S. Atty., John H. D. Wigger, Atty., Dept. of Justice, on brief), for defendants.

John W. Douglas, Washington, D. C. (Hugh B. Cox, William H. Allen, Earl E. Eisenhart, Jr., Washington, D. C., H. Merrill Pasco, Richmond, Va., Verner, Liipfert & Bernhard and Covington & Burling, Washington, D. C., on brief), for defendant-intervenors, Southern Ry. Co. and others.

Edward B. Hipp, Gen. Counsel, Raleigh, N. C., for defendant-intervenor, North Carolina Public Utilities Commission. George A. Goodwyn, Asst. Atty. Gen. (T. Wade Burton, Atty. Gen. of North Carolina, on brief), for defendant-intervenors, North Carolina State Highway Commission and others.

Harry M. Lightsey, Jr., Asst. Atty. Gen., for defendant-intervenors, Public Service Commission of South Carolina and others.

Before BRYAN, Circuit Judge, and LEWIS and BUTZNER, District Judges.

ALBERT V. BRYAN, Circuit Judge.

The pith of this controversy is the accusation by the plaintiff railroads[1]

---

1. Seaboard Air Line Railroad Company; Atlantic Coast Line Railroad Company; Louisville and Nashville Railroad Company; Georgia Railroad & Banking Com-

"that the local point-to-point carload commodity rates maintained by defendant-intervenors [Southern Railway System [2]] on sand, gravel, and crushed stone, at times hereinafter called aggregates, in those * * * [Southern] regions, are unjust and unreasonable in violation of Section 1 of the Interstate Commerce Act", 49 U.S.C. § 1 [3]. A complaint embodying this charge, and praying the cancellation of these rates with return to the previous ones, was dismissed by the Interstate Commerce Commission, and the complainants now sue to set aside and enjoin enforcement of that order,[4] 28 U.S.C. §§ 1336, 2321. We think the suit cannot succeed.

The assailed rates—21 altogether—were put into effect in March 1963 and later. The complaint was filed before the Commission on July 29, 1963. Much lower than the rates theretofore prevailing, they do not apply at any points at which the lines of the defendants are in competition with the lines of other railroads.

The Commission found that the new rates were "established to attract or to recapture a portion of the available aggregates traffic". It also found that the cost of transportation of aggregates is "a major factor in determining whether those commodities can compete in various markets". Indeed, the Commission said, on hauls of 24 miles the prior rates on sand and gravel were almost two-thirds of their commercial value, and at 72 miles they more than exceeded this value. A somewhat similar ratio existed with reference to crushed stone. The new rates are appreciably less than the commercial value of any of these items.

Although, according to the Commission's findings, the production and sales of aggregates "expanded tremendously in the southeastern States during the period, 1952–61", the participation of railroads in the movement of them "steadily declined". What had been the railroads' freight had gone to unregulated truck haulage. To invite this business again, Southern not only introduced the new rates but converted large numbers of obsolete 50-ton, open top, coal hopper cars to handle aggregates. The conversion consisted of merely coupling pairs of these cars, as a cost of $16.19, to form what is known as an articulated car.

The results of Southern's efforts are summarized by the Commission as follows:

"Under the assailed rates, defendants have experienced a substantial increase in the volume of their aggregates traffic, with a consequent increase in gross revenues. This is so despite complainants' contention that this traffic is extremely short-haul and by nature inherently suited to truck movement.

"The assailed rates have been in effect for over 3 years. No shipper or other mode of carriage has appeared in opposition to those rates. During the period from the filing of the instant complaint on July 29, 1963, through oral argument on March 16, 1966, complainants have not shown any direct or indirect injury to themselves, to the shippers, or to defendants."

pany, operated as The Georgia Railroad by lessees; Carolina, Clinchfield and Ohio Railway; and Carolina, Clinchfield and Ohio Railway of South Carolina.

2. Southern Railway Company (Southern Railway), The Cincinnati, New Orleans and Texas Pacific Railway Company, The Alabama Great Southern Railway Company, New Orleans and Northeastern Railroad Company and Carolina and Northwestern Railway Company, all members of the Southern Railway System.

3. "§ 1(5). Just and reasonable charges. All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

4. No. 34303, Seaboard Air Line Railroad Company et al. v. Southern Railway Company et al., decided August 16, 1966, 329 ICC 17.

The plaintiffs object to any significance given to the want of proof of any injury to them. They say there was no occasion for further proof, as they had already demonstrated the less-than-cost scale for the carriage of aggregates. Injury, they argue, is inherent in such transportation and apparent in two ways. First, it induces the establishment of aggregate pits or quarries on or near the lines of Southern rather than along the tracks of other roads; and, secondly, unprofitable rates are destructive in their tendency to spread to other carriers and commodities. Answers are readily at hand. Aside from any burden on the plaintiffs to prove injury, its non-appearance not only as to plaintiffs, but as to *any* person, is a factor to be weighed in the survey of the rates. Finally, apprehension of contagion—for none is evident—in the lower rates cannot be used to denounce them. It is a concern which is subject to control at any time on application to the Commission. United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 509, 55 S.Ct. 462, 79 L.Ed. 1023 (1935).

The chief premise of the plaintiffs' indictment of the new rates as unjust and unreasonable—and therefore violative of § 1 I.C.A., 49 U.S.C. § 1—is that they are below a minimum reasonable level. Further refined, the averment is that they are not compensatory, i. e. they produce less revenues than the out-of-pocket cost of the transportation. Thus mounted, the assault on the Commission's decision is (1) its failure to make a finding determinative of this accusation in accordance with the Administrative Procedure Act, 5 U.S.C. § 557 [5]; and (2) the Commission's failure to cancel the new rates on the plaintiffs' showing of below-cost service.

These grounds are not well taken. Both complainants and defendants adduced cost evidence in regard to their respective comments upon the reasonableness of the accused rates. With candor plaintiffs acknowledge that they had the burden of convincing the Commission of the unlawfulness of the new rates. The conclusion of the Commission was thus stated:

"We find, upon consideration of numerous factors in this record including, but not limited to, the increased tonnage moving under the assailed rates with a consequent increase in gross revenues and the lack of direct or indirect injury to any person, including complainants, that the assailed rates are not shown to be unjust and unreasonable."

True, no specific finding was made on the issue of costs versus revenues. The reason is that decision did not go upon that ground. The Commission implied that the plaintiffs' contention of no net earnings on aggregates might be accepted without affecting its ultimate conclusion. Moreover, the Commission had prefaced its report and order with the statement:

"Exceptions and requested findings not specifically discussed in this report nor reflected in our findings or conclusions have been considered and found not justified."

These indirect and direct determinations, together with the overall pronouncement of the Commission, certainly comply with both the letter and object of the Administrative Procedure Act. Cf. Alabama G. S. R. Co. v. United States, 340 U.S. 216, 227–228, 71 S.Ct. 264, 95 L.Ed. 225 (1951).

The question now is whether the Commission could deny the complaint in the face of an affirmative showing of no net earnings, or no showing of net earnings,

---

5. "The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—

"(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record; and

"(B) the appropriate rule, order, sanction, relief, or denial thereof."

from the new tariff. The Commission stated it could do so, and had done so in this case:

"However, cost data are not the only bases for a determination of the reasonableness of the assailed rates. While it is true that in absence of other probative evidence cost data may be the crucial factor, our conclusion herein as to the reasonableness of the assailed rates is based on broader criteria. * * * The words 'just and reasonable' are not fixed, unalterable, mathematical terms. The determination of what is a reasonable rate, measured solely by cost data, would seriously limit the exercise of a flexible judgment. * * * "

In New Automobiles in Interstate Commerce, 259 ICC 475, 534, the Commission defined generally what is a just and reasonable rate, saying:

"What constitutes a minimum reasonable rate is a matter to be determined in the light of the facts of record in each individual case, avoiding arbitrary action and keeping within statutory and constitutional limitations, just as in the case of maximum reasonable rates. Whether a rate is below a reasonable minimum depends on whether it yields a proper return; whether the carrier would be better off from a net revenue standpoint with it than without it; whether it represents competition that is unduly destructive to a reasonable rate structure and the carriers; and whether it otherwise conforms to the national transportation policy and the rules of ratemaking declared in the act of 1940."

■ The present holding of the Commission can be fitted into this formula without violence to it. In any event, the prescription is not frozen. The courts have recognized that the measure of justness and reasonableness is not limited in all circumstances to the yardstick of net revenue.[6] Other, or "broader"

criteria may be looked to in the ascertainment. For example, the opinion in Alabama G. S. R. Co. v. United States, supra, 340 U.S. 216, 223, 71 S.Ct. 264, 270, footnote 4 observed:

"Both the Commission and this Court have consistently rejected any thought that costs should be the controlling fact in rate making. [Citations omitted.]"

Again, Davis & Randall, Inc. v. United States, 219 F.Supp. 673, 677 (W.D.N.Y. 3-judge court, 1963) acknowledged the prerogative of the Commission to allow non-profit rates:

"D & R's first argument is that the Commission could not lawfully proscribe the rates solely on the ground that they were noncompensatory, without taking into account other evidence of reasonableness, such as the shipper's need for the rates to enable it to compete more effectively in the Ohio, Indiana and Illinois markets, the lack of adverse effect upon competing carriers since the traffic was not moving by rail under existing rates anyway, and the higher revenue per vehicle-mile produced by the proposed rates than by existing rates for shorter hauls. Consideration of such factors would have been altogether appropriate—particularly so in this case, since the absence of protest by, and of evidence of adverse effect on, competitors, left protection of the carrier against its own unwisdom and the possible consequent burdening of its other traffic as the only bases for government intervention. But although the Commission under some circumstances may permit a carrier to establish a rate not proved to cover out-of-pocket costs, it is not required to do so. * * * "

While the Court was speaking to unconstitutional confiscation, still it pointed out in Baltimore & O. R. R. v. United States, 345 U.S. 146, 150, 73 S.Ct. 592, 594, 97 L.Ed 912 (1953), that noncom-

---

6. See State of New York v. United States, 256 F.Supp. 634, 637–638 (W.D.N.Y. 1966), aff'd 386 U.S. 349, 87 S.Ct. 1161, 18 L.Ed.2d 98 (March 20, 1967).

pensatory rates limited to only particular commodities were not per se unjust and unreasonable. What counts is the effect of the rates upon the entire earnings of the railroad's operation. There the court said:

"And so long as rates as a whole afford railroads just compensation for their over-all services to the public the Due Process Clause should not be construed as a bar to the fixing of noncompensatory rates for carrying some commodities when the public interest is thereby served."

■ There was no error in the Commission's subordination of cost to what it believed to be more predominant components of rates for the transportation of aggregates, only one of myriad commodities moved by Southern. In our judgment it justifiably refused to find the new rates unjust and unreasonable, despite the imputation of noncompensativeness to them, in the frame of circumstances here. These, to recapitulate, are the lack of direct or indirect injury to any person; the retaking from unregulated trucks of business previously and still permissibly enjoyed by Southern; provision of additional and cheaper facilities for transportation of aggregates; and advocacy by the State authorities of the new rates together with the absence of objection by truckers. The distillate from a careful condensation of all of these considerations was incisively put by the Commission:

"* * * These circumstances, [those enumerated supra] taken together, represent a particular and highly unique situation wherein, in our view, the only proximate deleterious effect of the proposed reduced rates would be on Southern's own revenue requirements. We are not inclined to second-

guess Southern's estimates and find that it is dissipating its funds. Rather, we commend its attempt, through the exercise of managerial discretion, to regain and improve its position in the movement of aggregate traffic."

■ Motions were pressed by the defendants to dismiss this suit on the ground that the plaintiffs had suffered no injury from the prescription of the new rates. We have denied the motion, notwithstanding, because we believe the plaintiffs do have standing to prosecute the suit. Section 13 of the I.C.A., 49 U.S.C. § 13, expressly authorizes the plaintiffs to present their grievances to the Commission by a complaint as they have proceeded in this case. Section 13(2), 49 U.S.C. § 13(2) prohibits the dismissal of any such complaint "because of the absence of direct damage to the complainant". If the plaintiffs have this stature before the Commission, we think their locus standi should be as fully recognized in any suit to enforce or set aside the action of the Commission as permitted in 28 U.S.C. §§ 1336, 2284 and 2321, supra.

■ Likewise, we think that the several State officers and administrative agencies, tentatively allowed to intervene as defendants herein, were rightly admitted over the objection of the plaintiffs. The statute, 28 U.S.C. § 2323, expressly stipulates for the admission of "communities, associations, corporations, firms, and individuals interested in the controversy or question before the Commission". The phraseology indicates an intention to permit the intervention of appropriate State agencies and officers.

An order will be entered denying the prayers of the complaint and dismissing the action.

Complaint and action dismissed.