## INTERSTATE COMMERCE COMMISSION *v.* NEW YORK, NEW HAVEN & HARTFORD RAILROAD CO. ET AL.

No. 108.   Argued February 28, 1963.—Decided April 22, 1963.*

*Together with No. 109, *Sea-Land Service, Inc.,* v. *New York, New Haven & Hartford Railroad Co. et al.;* No. 110, *Seatrain Lines, Inc.,* v. *New York, New Haven & Hartford Railroad Co. et al.;* and No. 125, *United States* v. *New York, New Haven & Hartford Railroad Co. et al.,* on appeals from the same Court.

*Robert W. Ginnane, Warren Price, Jr.* and *Ralph S. Spritzer* argued the cause for appellants. *Solicitor General Cox, Assistant Attorney General Loevinger* and *Lionel Kestenbaum* were on the brief for the United States. *Robert W. Ginnane* and *B. Franklin Taylor, Jr.* were on the brief for the Interstate Commerce Commission. *Warren Price, Jr.* was on the brief for appellant in No. 109. *Ralph D. Ray* and *Warren E. Baker* were on the brief for appellant in No. 110.

*Carl Helmetag, Jr.* argued the cause for appellees. With him on the brief were *James A. Bistline, Ernest D. Grinnell, Jr., J. Edgar McDonald, Charles P. Reynolds* and *Albert B. Russ.*

Briefs of *amici curiae,* urging reversal, were filed by *Peter T. Beardsley, Richard R. Sigmon* and *Bryce Rea, Jr.* for American Trucking Associations, Inc., et al., and by *Samuel H. Moerman, Arthur L. Winn, Jr., J. Raymond Clark* and *James M. Henderson* for Waterways Freight.

Brief of the National Industrial Traffic League, as *amicus curiae,* urging affirmance, was filed *by John F. Donelan* and *John M. Cleary.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case, involving four consolidated appeals from a three-judge District Court judgment setting aside an order of the Interstate Commerce Commission to the extent that it rejected certain proposed railroad rate decreases, brings before us important questions relating to the role of the Commission in its task of overseeing competition among different modes of transportation. The case is the first in which this Court has considered the interpretation and application of § 15a (3) of the Interstate Commerce Act, added by Congress in the Transportation Act of 1958.[1]

## I.

The two corporate appellants here, Sea-Land Service, Inc. (formerly Pan-Atlantic Steamship Corporation), and Seatrain Lines, Inc., are common carriers by water engaged in the Atlantic-Gulf coastwise trade; they are the only two companies now performing this service. Sea-Land, which had operated as a "break-bulk"[2] carrier for many years, in 1957 suspended that service and converted

---

[1] Section 15a (3) of the Interstate Commerce Act, 72 Stat. 572, 49 U. S. C. § 15a (3), provides:

"In a proceeding involving competition between carriers of different modes of transportation subject to this Act, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this Act."

[2] This break-bulk service involved the physical unloading of freight from rail car or truck and the loading of the cargo into the ships, with the operation reversed at the port of destination.

four ships into crane-equipped trailerships, each capable of holding 226 demountable truck trailers. With these ships, freight could be moved by highway trailers to the port of origin, the trailers lifted onto the ships, and the process reversed at the port of destination. As a result, Sea-Land was able to provide a motor-water-motor service which afforded door-to-door delivery of goods from and to all shippers and consignees, even if not situated on a railroad siding, in containers that would not have to be opened in transit. Traditionally water rates, including water-rail and water-motor rates, have been lower than the corresponding all-rail rates, and when Sea-Land inaugurated its new trailership service in 1957, it published reduced rates which were generally 5% to 7½% lower than the corresponding all-rail boxcar rates. Some 700 of these reduced rates were placed under investigation by the Commission.

In Seatrain's service, freight is transported to the company's dock in railroad cars, the cars and their contents are then lifted onto Seatrain's vessels, and at destination the cars are unloaded and delivered by rail to the consignee. This rail-water-rail service is similar to railroad boxcar service, in that it permits carriage from shipper to consignee without breaking bulk when both shipper and consignee are located on railroad sidings.

Railroad "piggy-back," or trailer-on-flatcar (TOFC), service is like that provided by Sea-Land. A motor carrier trailer is hauled by road to a railhead, loaded onto a flatcar, and demounted at destination for delivery by motor carrier to the consignee.

Before 1957, railroad TOFC rates were generally higher than all-rail boxcar, water, and land-water rates. But in 1957, primarily in answer to the new improved service and lower rates offered by Sea-Land, the appellee railroads proposed to establish, on an experimental basis, reduced rates on 66 commodity movements between cer-

tain eastern points on the one hand and Fort Worth and Dallas, Texas, on the other.[3] These rates, which were substantially on a parity with Sea-Land and Seatrain rates on the same traffic, were suspended and placed under investigation by the Commission. In December 1960 the Commission disposed of 43 docket proceedings by issuing a consolidated report embracing the railroad TOFC rates involved here as well as a number of Sea-Land and Seatrain rates not now before us. 313 I. C. C. 23.

The Commission found that the proposed TOFC rates were compensatory, that is, they equaled or exceeded out-of-pocket costs; for all of the listed movements by railroad-leased flatcars capable of carrying two trailers (TTX cars), and for all but six of the listed movements by railroad-owned single trailer cars.[4] The Commission further found that the proposed rates equaled or exceeded fully

---

[3] Since the establishment of these reduced rates would leave higher rates in effect to and from certain intermediate points involving shorter hauls, thus violating the long- and short-haul provisions of § 4 (1) of the Act, 49 U. S. C. § 4 (1), the railroads also applied to the Commission for the relief from these provisions which § 4 (1) permits the Commission to grant. This fourth-section application was denied by the Commission because, for reasons summarized in the text of this opinion, the Commission found the proposed TOFC rates not shown to be just and reasonable. With respect to the fourth-section application itself, the Commission noted that "[n]o shippers or receivers located at the intermediate points oppose the granting of fourth-section relief." 313 I. C. C., at 33. Indeed, no individual shippers came forward to urge that the selective character of the reduced TOFC rates here involved in any way discriminated against them, and in this Court the National Industrial Traffic League, a nationwide organization of shippers, has filed a brief as *amicus curiae* urging affirmance of the decision below.

[4] The rates for these six movements were withdrawn and are not at issue. (The Commission had stated that it had no way of knowing the percentages of TOFC traffic that would move in TTX cars and the percentage that would move in railroad-owned cars and had thus concluded that the rates for the six movements in question had not been shown to be compensatory.)

distributed costs [5] for 43 of the 66 movements by TTX cars and 14 of 66 movements by railroad-owned cars.

Having made these findings, the Commission addressed itself to what it considered the "most important" question—"whether these [TOFC] rates constitute destructive competition." 313 I. C. C., at 44. It noted at the outset that, apart from the question of rates, most shippers prefer rail service to Sea-Land and Seatrain service and that, in order to attract traffic, the latter carriers must therefore establish rates somewhat below those of the railroads. As to relative costs, the Commission stated that Sea-Land costs, both out-of-pocket and fully distributed, were below railroad TOFC costs for all 66 movements using railroad-owned flatcars and for all but 2 of the 66 movements using TTX cars. But the Commission explicitly refrained from relying on these findings. Instead it concluded that because of a number of factors:

> "[W]e cannot determine on these records where the *inherent advantages* may lie as to any of the rates in issue. We must recognize, also, that cost is only one of the elements which may appropriately be considered in passing upon the lawfulness of rates. In the exceptional circumstances here presented, other considerations, herein discussed, appear to us determinative of the issues." 313 I. C. C., at 46. (Emphasis added.)

The Commission acknowledged that the recently enacted § 15a (3) prohibited it from holding rail rates up to a particular level merely to protect the traffic of another

---

[5] The Commission has stated, in discussing railroad costs, that: "Fully distributed costs based on the out-of-pocket costs plus a revenue-ton and revenue ton-mile distribution of the constant costs, including deficits, indicate the revenue necessary to a fair return on the traffic, disregarding ability to pay." *New Automobiles in Interstate Commerce*, 259 I. C. C. 475, 513 (1945).

mode but emphasized that the prohibition was qualified by the phrase "giving due consideration to the objectives of the national transportation policy declared in this Act." [6] In this case, the Commission stated, the reduced TOFC rates were an initial step in a program of rate reductions that could "fairly be said to threaten the continued operation, and thus the continued existence, of the coastwise water-carrier industry generally." 313 I. C. C., at 47. Since in the Commission's view the coastwise shipping so threatened was important to the national defense, to the shipping public, and to the economy of ports and coastal areas,[7] it concluded that the objectives

[6] The National Transportation Policy, 54 Stat. 899, 49 U. S. C. preceding § 1, was added to the Interstate Commerce Act in 1940. It provides:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

[7] In support of these conclusions, the Commission quoted with approval passages from a 1955 report of the United States Maritime Administration, "A Review of the Coastwise and Intercoastal Shipping Trades," which emphasized the national defense importance of break-bulk cargo ships; from a 1950 congressional report, S. Rep. No. 2494, 81st Cong., 2d Sess. 17, which referred to "the importance to

of the National Transportation Policy required the establishment and maintenance of a differential between rail rates and those of Sea-Land and Seatrain which would enable the coastwise carriers to continue their service. The Commission decided that an appropriate differential to accomplish this purpose would be 6% over Sea-Land rates for TOFC service and somewhat less than 6% for boxcar service. Accordingly, the proposed TOFC rates were ordered to be canceled, without prejudice to the filing of new schedules in conformity with the Commission's views.[8]

The appellee railroads then brought this action before a three-judge District Court seeking to have the Com-

national defense of having domestic tonnage readily available"; and from a 1945 Commission decision, *War Shipping Admin. T. A. Application*, 260 I. C. C. 589, 591, which spoke of the "dependency of ports and coastal areas upon the existence of water transportation."

[8] Five of the 10 Commissioners then in office joined in the entire report. A sixth, Commissioner Hutchinson, concurred, stating that he was "in general agreement with the majority report," 313 I. C. C., at 50, adding his own view that "the ultimate effect of approval of the [TOFC] schedules would be to allow rates of the high-cost carrier [TOFC] to gravitate to a level whereby the low-cost carrier [sea-land] will be forced to go below its full costs in order to participate in the traffic." *Id.*, at 51. He also expressed some doubt as to whether a 6% differential was warranted. Commissioner McPherson, concurring in part, would have approved all compensatory rates but would have imposed no differential. Three Commissioners (Commissioner Freas, joined by Chairman Winchell and Commissioner Webb) dissented on the ground that the Act neither required nor permitted "blanket protection" for water carriers or for any mode of transportation. *Id.*, at 51–52.

In view of our disposition of this case, it is not necessary to consider whether, in light of Commissioner Hutchinson's concurrence, the "majority report" in fact represented the views of a majority of the Commission and, if not, whether the Commission's decision could be sustained in the absence of any rationale commanding the support of a majority of the agency. Cf. *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 U. S. 80.

mission's order set aside to the extent that it required cancellation of the proposed TOFC rates. In November 1961, the court handed down its opinion, setting aside the Commission's order in part and enjoining the Commission from canceling TOFC rates which return at least fully distributed costs, except on the basis of certain specified findings. 199 F. Supp. 635. The court held that "at least on this record," § 15a (3) prohibited the imposition of a rate differential to protect the water carriers. The reference to the National Transportation Policy in § 15a (3), the court said, was intended to qualify the prohibition of mandatory differentials

". . . only when factors other than the normal incidents of fair competition intervened, such as a practice which would destroy a competing mode of transportation by setting rates so low as to be hurtful to the proponent as well as his competitor or so low as to deprive the competitor of the 'inherent advantage' of being the low-cost carrier." 199 F. Supp., at 642.

The court went on to discuss in some detail its understanding of the way in which costs of service for the different transportation modes were determined, the possible reasons why the Commission had been reluctant to accept relative costs as critical, and the precise circumstances under which the Commission could properly require cancellation of certain TOFC rates. Finally, in rejecting the argument that a differential was required in the interests of the national defense, the court stated that the reference to the national defense in the National Transportation Policy was merely a "hoped-for 'end,' " not an operative policy, and that in any event the Commission's conclusion with respect to the national defense was not supported by adequate evidence.

We noted probable jurisdiction, 371 U. S. 808, because of the importance of the questions presented in effectuating the congressional design embodied in the Interstate Commerce Act.[9]

## II.

The significance of § 15a (3) to the determination of these appeals can best be understood after consideration of the legislative history of this provision.

Section 15a (3) was the result of several years of congressional consideration of the problems of the transportation industry as a whole and of the railroads in particular. Concerned with their declining share in an expanding market, and with what they regarded as improper administrative interference with their efforts to compete, the railroads vigorously supported legislation introduced in 1955 on the basis of a proposal by the Secretary of Commerce. H. R. 6141, 84th Cong., 1st Sess. This bill, which became known as "the three shall-nots," would have amended § 15a (1) of the Act to provide that in determining whether a rate is less than a reasonable minimum, the Commission

". . . shall not consider the effect of such charge on the traffic of any other mode of transportation; or

---

[9] There is some question as to precisely what rates are in issue here; the United States and the Commission suggest that these appeals relate only to the TOFC rates which are equal to or exceed fully distributed costs, since the court below did not enjoin the Commission from canceling compensatory TOFC rates under that level. As we read the opinion and judgment below, however, the Commission's order was set aside insofar as it canceled *all* of the proposed TOFC before the court, and thus any order entered by the Commission in the future with respect to those rates would be subject to full judicial review. Accordingly, we reject as too narrow the position that the relevance of the present appeals is limited to TOFC rates that return at least the fully distributed costs of carriage.

the relation of such charge to the charge of any other mode of transportation; or whether such charge is lower than necessary to meet the competition of any other mode of transportation . . . ."

This bill was strongly opposed by the Commission and by other carriers, and died in committee. A substantially similar bill, however, was introduced in the next Congress, H. R. 5523, 85th Cong., 1st Sess., and the Commission renewed its opposition. When, after hearings, a Senate subcommittee recommended a bill to its parent committee, it explicitly rejected the three "shall-nots." But at the same time it expressed its concern with "over-regulation" and emphasized that its own proposal to add a new § 15a (3) was designed to encourage competition among the different modes and to permit each mode to assert its *inherent advantages.* S. Rep. No. 1647, 85th Cong., 2d Sess. 10, 18–19. The bill at this stage provided that in a proceeding involving competition with another mode

". . . the Commission, in determining whether a rail rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by railroad *and not by such other mode.*" *Id.,* at 18. (Emphasis added.)

At hearings before the full Senate Commerce Committee, the Commission opposed the bill as drafted, not because it disagreed with the principles set out in the subcommittee report but because it feared that the language used, particularly the italicized portion, was inconsistent with those principles and was substantially equivalent to the three "shall-nots." Hearings on S. 3778 before the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess. 165–185. In particular Commissioner (then Chairman) Freas expressed concern that if the Commission were foreclosed from considering the effect

of a rate on a competing mode, it would be powerless to reject a railroad rate which covered the railroad's out-of-pocket costs, even if that rate had the effect of destroying the inherent advantages of a lower-cost carrier. He stated:

"Whenever conditions permit, given transportation should return the full cost of performing carrier service. . . . In many instances, however, the full cost of the low-cost form of transportation exceeds the out-of-pocket cost of another. If, then, we are required to accept the rates of the high cost carrier merely because they exceed its out-of-pocket costs, we see no way of preserving the inherent advantages of the low cost carrier." *Id.*, at 168.

Commissioner Freas made it clear that the Commission believed the railroads should be permitted to assert their inherent advantages too, *id.*, at 172, and suggested that any proposal specifically authorize the Commission to give "due consideration to the inherent cost and service advantages of the respective carriers," *id.*, at 169. In further discussion, it was indicated that it would be inconsistent with the National Transportation Policy to permit destruction of the inherent advantages of any mode of transportation, *id.*, at 170–171, 177, and when Senator Potter suggested the deletion of the phrase "and not by such other mode" and the addition of a reference to the National Transportation Policy, Chairman Freas answered: "We will buy Senator Potter's suggestion." *Id.*, at 177–178. Senator Potter's suggestion was adopted in the final version of the bill.

Other testimony of particular interest here is that of John L. Weller, President of Seatrain, who testified on behalf of Seatrain and Pan-Atlantic (now Sea-Land). In opposing the bill recommended by the subcommittee, Mr. Weller emphasized that he did not seek any more than

to make it possible for the Commission to preserve the inherent advantages of the water carriers he represented:

"As I explained, our kind of operation can only exist with a differential under the railroad rates; that is No. 1. *We are not entitled to have such a differential, nor do I urge one, except in the case where cost is lower than the railroad cost.* We have no right to ask for anything more than that." *Id.,* at 30. (Emphasis added.)

The proposal reported out by the Senate Commerce Committee was in the form ultimately adopted by Congress and contained the key provision that rates "shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this Act." The Committee, quoting with approval the subcommittee's report, made it clear that the purpose of the proposal was to permit each mode of transportation to assert its "inherent advantages, whether they be of service or of cost." S. Rep. No. 1647, 85th Cong., 2d Sess. 3. The new subsection, the Committee stated, was designed to reaffirm the intent of the 1940 Act, an intent that had been correctly construed by the Commission in 1945 in *New Automobiles in Interstate Commerce,* 259 I. C. C. 475, but which, in the Committee's view, had not been consistently followed.[10] The particular passage in

---

[10] During the hearings, Senator Smathers had referred to several Commission decisions, *e. g., Petroleum Products in Ill. Territory,* 280 I. C. C. 681, 691 (1951); *Petroleum Products from Los Angeles to Arizona and New Mexico,* 280 I. C. C. 509 (1951), which were believed to have substantially departed from the principles laid down in *New Automobiles.* Hearings on S. 3778 before the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess. 174–175.

the *New Automobiles* decision which the Committee endorsed contained the statement:

> "[T]here appears no warrant for believing that rail rates, for example, should be held up to a particular level to preserve a motor-rate structure, or vice versa." 259 I. C. C., at 538.

This theme—that Congress was firmly opposed to rates maintained by the Commission at an artificially high level merely to protect competing modes—was repeated in the House Commerce Committee report, H. R. Rep. No. 1922, 85th Cong., 2d Sess., and in the debates on the floor of both Houses. 104 Cong. Rec. 10822, 10841–10843, 10858–10859, 12524, 12531, 15528. As stated by Representative Harris, Chairman of the House Commerce Committee, if a carrier could provide a rate that was "fully compensatory," the Commission could not force it up to a higher level "just because it is necessary to keep another mode of transportation in business." *Id.*, at 12531. The mood of Congress was perhaps best summarized by Senator Smathers when he said:

> "[W]e are going to eliminate some of the paternalism which has heretofore existed in the minds of the Interstate Commerce Commission. I think we will breathe into our whole system of transportation some new competition, which of course is needed, because the public and the consumer will benefit therefrom." *Id.*, at 15528.

This revealing legislative history fills out the contours of § 15a (3). There can be no doubt that the purpose of this provision was to permit the railroads to respond to competition by asserting whatever inherent advantages of cost and service they possessed. The Commission, in the view of the proponents of the bill, had thwarted effective competition by insisting that each form of transpor-

tation subject to its jurisdiction must remain viable at all costs and must therefore receive a significant share of the traffic. It had, in the words of one Congressman, become a "giant handicapper." [11]

Moreover, it is clear that Congress did not consciously or inadvertently defeat this purpose when it included in § 15a (3) a reference to the National Transportation Policy. The principal reason for this reference, as the hearings show, was to emphasize the power of the Commission to prevent the railroads from destroying or impairing the inherent advantages of other modes. And the precise example given to the Senate Committee, which led to the language adopted, was a case in which the railroads, by establishing on a part of their operations a compensatory rate below their fully distributed cost, forced a smaller competing *lower cost* mode to go below its own fully distributed cost and thus perhaps to go out of business.

### III.

We agree with the District Court that "at least on this record," the Commission's rejection of the TOFC rates here at issue and the requirement of a differential over the rates of the coastwise carriers were not consistent with the mandate of § 15a (3). In light of the findings and conclusions underlying the Commission's decision, and more particularly its putting aside the question of "inherent advantages," its insistence that TOFC rates, in the words of the prohibition in § 15a (3), "be held up to a particular level to protect the traffic" of the coastwise carriers cannot be justified on the basis of the objectives of the National Transportation Policy. Since the Commission appears to have relied principally on two aspects of that policy—(i) the prohibition of "unfair or destruc-

---

[11] Hearings, *supra,* note 10, at 82.

tive competitive practices," and (ii) the objective of preserving a transportation system "adequate to meet the needs of the commerce of the United States . . . and of the national defense" (note 6, *supra*)—we shall consider each of these aspects separately.

1. *Unfair or Destructive Competitive Practices.*—If there is one fact that stands out in bold relief in the legislative history of § 15a (3), it is that Congress did not regard the setting of a rate at a particular level as constituting an unfair or destructive competitive practice *simply* because that rate would divert some or all of the traffic from a competing mode. Moreover, neither the Commission representative nor the witness who testified on behalf of the appellant carriers (*supra,* pp. 754–756) took this position, since they too recognized that such an interpretation would be inconsistent with the mandate of the National Transportation Policy to "preserve the inherent advantages of *each*" mode of transportation. If a carrier is prohibited from establishing a reduced rate that is not detrimental to its own revenue requirements merely because the rate will divert traffic from others, then the carrier is thwarted from asserting its own inherent advantages of cost and service. Nor should the selective character of such a rate reduction, made in response to a particular competitive situation, be permitted, without more, to furnish a basis for rejecting the rate. Section 15a (3), in other words, made it clear that something more than even hard competition must be shown before a particular rate can be deemed unfair or destructive. The principal purpose of the reference to the National Transportation Policy, as we have seen, was to prevent a carrier from setting a rate which would impair or destroy the inherent advantages of a competing carrier, for example, by setting a rate, below its own fully distributed costs, which would force a competitor with a cost advantage on particular transportation to establish an unprofitable rate in order to attract traffic.

It is true that in the present case the Commission found that with respect to virtually all of the TOFC movements involved, Sea-Land's out-of-pocket and fully distributed costs were below those of the railroads. But the Commission at the same time explicitly stated that "we cannot determine on these records where the inherent advantages may lie as to *any* of the rates in issue." 313 I. C. C., at 46. (Emphasis added.) It is not for us to make this determination at this stage, or to decide in advance precisely how either carrier's inherent advantages should be measured or protected.[12] It may be, for example, that neither a comparison of "out-of-pocket" nor a comparison of "fully distributed" costs, as those terms are defined by the Commission, is the appropriate method of deciding which of two competing modes has the cost advantage on a given movement.[13] And even if the cost advantage on each movement were determined to lie with the coastwise carriers, it may be that some or all of the TOFC rates at issue here should be allowed to stand because they

---

[12] It was argued below, and at least intimated here, that the railroads had failed to sustain the burden of proving that they had the relative cost advantage. But we agree with the court below that if a carrier shows a proposed rate to be just and reasonable from the standpoint of its own revenue requirements, it is for a protesting carrier who relies on a claim of inherent cost advantage to bear the burden of persuading the Commission of the existence of that advantage. Of course, when such an issue is raised, each carrier should bring forward the data relating to its own costs that are required for resolution of the issue. See *Various Commodities from or to Ark. & Tex.*, 314 I. C. C. 215.

[13] The utility of the concepts of fully distributed and out-of-pocket costs may be limited to the area in which they have traditionally been used—that of determining the reasonableness of a rate from the standpoint of a carrier's own revenue requirements. If so, some different measure may be preferred for comparing the costs of two or more modes of transportation.

would not unduly impair that advantage.[14]   These and other similar questions should be left for initial resolution to the Commission's informed judgment.

The court below set out at some length its understanding of the Commission's methods of arriving at carrier costs, its analysis of the role of "value-of-service" concepts in rate making, and its views of the precise circumstances under which the Commission could lawfully disallow the TOFC rates at issue.   We find it unnecessary to consider that discussion in this instance, since we hold only that on the present record, the disallowance of the rates in question was not adequately supported.   Cf. *Securities & Exchange Comm'n* v. *Chenery Corp.,* 318 U. S. 80, 87.

2. *The Needs of the Commerce of the United States and of the National Defense.*—The Commission gave considerable weight to the factor of "national defense" and perhaps of "commerce" in arriving at its decision. But the District Court discounted these factors, concluding that the reference in the National Transportation Policy to the national defense (and presumably to commerce as well) represented merely a "hoped-for 'end,' " not an operative policy.   We disagree with this conclusion, but hold that the Commission's reliance on these

---

[14] Even though carrier A may have lower costs than carrier B, the *overall advantage* may rest with B, for example, if the difference in cost is very slight but the service of B is so superior as to outweigh any such marginal cost difference.   In this event a rate established by B may be lawful even if it has the effect of diverting some or all of A's traffic.

Conversely, the cost advantage of A over B may be so great that even if B were to reduce its rate to the level of its out-of-pocket costs, A might be able to continue to compete effectively and still charge a profitable rate.   In this event B's reduced rate would not appear to impair A's inherent cost advantage.

factors was not supported by adequate findings or substantial evidence.

The primary reason for the reference to the National Transportation Policy in § 15a (3) was to confirm the Commission's power to protect the inherent advantages of all carriers from destructive competition. But we cannot conclude that this was the *only* reason, especially in view of the choice not to accept the Commission's proposal, which would have expressed the qualification in terms of the inherent advantage element alone. See p. 755, *supra*. Nor can we conclude that the statutory references to such vital considerations as national defense are mere window dressing, without any practical significance in terms of the Commission's function. "Congress unequivocally reserved to the Commission power to regulate reasonableness of interstate rates in the light of the needs of national defense." *United States v. Capital Transit Co.*, 325 U. S. 357, 362.

On the other hand, by recognizing the relevance of such considerations as national defense, we do not imply that these broad policy factors may be applied so freely as to nullify either the more particularized mandates of the National Transportation Policy or the clear congressional design embodied in § 15a (3). Normally, it is these more specific considerations that should govern the lawfulness of proposed rates in a case involving intermodal competition. Only under extraordinary circumstances may the Commission properly permit them to be outweighed. To justify such a result, we believe it must be demonstrated that the proposed rates in themselves genuinely threaten the continued existence of a transportation service that is uniquely capable of filling a transcendent national defense or other public need.

Measured against this standard, the Commission's conclusions cannot be sustained. The Commission did state that the proposed rates were an "initial step" in a pro-

gram of rate reductions that "can fairly be said to threaten" the existence of the coastwise carriers, but it made no findings, and referred to no supporting evidence, to the effect that these particular TOFC rates would drive the corresponding water carrier rates below a profitable level or otherwise endanger the carriers' survival. Cf. *Burlington Truck Lines, Inc.,* v. *United States,* 371 U. S. 156, 167–168; *Gilbertville Trucking Co.* v. *United States,* 371 U. S. 115, 130–131. It is not enough to rely on the possible effect of other rate reductions not here in issue, a situation with which the Commission has ample power to deal if occasion arises.

Nor did the Commission present an adequate basis for concluding that either the national defense or any significant segment of the country's commerce depends upon the operation of Sea-Land or Seatrain.[15] We need not consider the question whether reliance on other additional sources might have been sufficient,[16] for we believe that the question is one for initial determination by the Commission, and that all parties should have an opportunity to adduce relevant evidence, including any evidence tending to indicate that *disallowance* of the proposed TOFC rates might adversely affect the commerce

---

[15] The materials relied upon by the Commission are referred to in note 7, *supra.* These materials were general in nature, and the most recent dated back to 1955. Further, they were not sufficiently related to the specific service rendered by Sea-Land and Seatrain, which, we were informed by Sea-Land's counsel at oral argument, have a combined total of only eight ships currently in operation.

[16] The Commission in its brief has cited the 1960 testimony of Vice Admiral Wilson and of the Mayor of Savannah, Georgia, in Decline of Coastwise and Intercoastal Shipping Industry, Hearings before the Merchant Marine and Fisheries Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 86th Cong., 2d Sess. 83–86, 105–106, and has also cited a 1961 letter from Vice Admiral Sylvester to Senator Butler, reproduced at 107 Cong. Rec. 7299–7302.

or the national defense of the country. Once raised, these considerations (like the factor of inherent advantage) do not exist solely for the benefit of protesting carriers.

In conclusion: We agree with the District Court that the Commission's order, insofar as it related to the TOFC rates at issue, must be set aside. We disagree, however, with that court's determination that the needs of the national defense are not an operative part of the National Transportation Policy, and we deem it inappropriate to approve or disapprove of other aspects of the court's opinion. Accordingly, we decide that the judgment below should be vacated, the order of the Commission set aside to the extent that it related to certain railroad TOFC rates described herein, and the cause remanded to the Commission for further proceedings consistent with this opinion.

*It is so ordered.*