**LAKE CARRIERS' ASSOCIATION**
et al., Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant,**
and
**Interstate Commerce Commission et al.,**
**Intervening Defendants.**

**No. C73–1149.**

United States District Court,
N. D. Ohio, E. D.

March 10, 1975.

Scott H. Elder, Johnson, Branand & Jaeger, Cleveland, Ohio, Charles J. McCarthy, Belnap, McCarthy, Spencer, Sweeney & Harkaway, Washington, D. C., for plaintiffs.

John Powers, Thomas E. Kauper, Howard Shapiro, Roger Andewelt, U. S. Dept. of Justice, Washington, D. C., for defendant United States.

Richard H. Streeter, Fritz R. Kahn, I. C. C., Washington, D. C., for the intervening Interstate Commerce Commission.

Harry N. Babcock, Cleveland, Ohio, Richard J. Murphy, Philadelphia, Pa., Charles C. Rettberg, Jr., Cleveland, Ohio, Donald M. Tolmie, Roanoke, Va., for the intervening railroads.

David G. Macdonald, John Guandolo, Macdonald & McInerny, Washington, D. C., A. T. Udrys, O. K. Petersen, Jackson, Mich., Joel J. Morris, Detroit, Mich., for the intervening Consumers Power Co.

## MEMORANDUM

Before CELEBREZZE, Circuit Judge, GREEN and CONTIE, District Judges.

BEN C. GREEN, District Judge.

This is an action to enjoin, annul, and set aside the order of the Interstate Commerce Commission (hereinafter Commission) in *Lake Carriers' Association v. The New York Central Railroad Company*, 343 I.C.C. 491 (1973), modified by an order of the Commission dated September 3, 1974, docket No. 34822. The plaintiffs are the Lake Carriers' Association and five steamship companies (hereinafter Lake Carriers).[1] Lake Carriers brought this action against the United States [2] pursuant to 28 U.S.C. § 2322; however, the defendants now include the Interstate Commerce Commission, Consumers Power Company, and four railroads,[3] all of whom have intervened. The Court's jurisdiction is predicated upon 28 U.S.C. § 1336, and a three-judge court was convened pursuant to 28 U.S.C. §§ 2321 and 2325.

This controversy concerns the transportation of coal from mines in Onco, Miller, Powhatan, Georgetown, Sunnyhill, and Freeport, Ohio, to two utility companies in Michigan, the Consumers Power Company at Essexville and the Detroit Edison Company at Detroit. At one time all of this coal was carried by rail from the mines to the lower Lake Erie ports of Toledo, Sandusky, Lorain, and Ashtabula, Ohio. 343 I.C.C. 491, 493 (1973). At the ports the coal was loaded into ships and transported to the utility companies. Beginning in 1966, however, the railroads offered a new type of all-rail service, known as unit-train service, directly to the utility companies at rates lower than those of the rail-lake routes.

The unit-train service provided by the railroads on the all-rail routes differs significantly from the rail service available on the rail-lake routes. The Report and Order of the Commission highlights the differences as follows:

Generally, unit-train tariffs provide for the movement of a train comprised of shipper—or consignee—owned cars

---

1. American Steamship Company; Amersand Steamship Company; Columbia Transportation Division of Oglebay Norton Company; Reiss Steamship Company; and Interlake Steamship Company, Division of Pickands Mather & Company.

2. The United States, although a defendant, agrees with the plaintiffs that the Commission's Order should be set aside. The government argues that the Commission employed an incorrect standard in determining which mode of transportation is the lower cost service. The government does not, however, take a position regarding the other issues in the case at bar. Because we do not think it necessary to reach the issue raised by the government, its arguments are not discussed in this memorandum. Whenever the word "defendants" is used herein, the reference does not include the United States.

3. George P. Baker, Richard C. Bond, and Jervis Langdon, Jr., Trustees of the property of the Penn Central Transportation Company, Debtor; The Baltimore and Ohio Railroad Company; The Chesapeake and Ohio Railway Company; and, Norfolk and Western Railway Company.

from one specified loading point to one consignee at one specified destination, and the return of the empty cars to the same origin at a specified rate per net ton. The tariffs provide an abbreviated period of free time for unloading (in this case, 6 hours) before car detention charges begin to accrue. In contrast, tariffs providing trainload rates on coal normally provide for the movement of a train composed of cars from more than on time [sic], and the cars from each mine, must be "blocked," that is, tendered as a unit. Moreover, trainload and carload rates normally· apply in connection with carrier-owned cars. 343 I.C.C. 491, 493 (1973).

Thus, under the unit-train system, a train of dedicated cars shuttles back and forth between only one mine and one utility company plant. The train's cars are provided by the shipper or consignee, here the utility companies, and not by the railroads.

In 1966 the Detroit Edison Company began to use the all-rail routes and by June, 1973, the date of the Commission's Report and Order, it no longer received any of its coal from the Ohio mines by the rail-lake routes. 343 I.C.C., *supra* at 500–501. In 1967, the Consumers Power Company's plant in Essexville received 2,781,901 tons of coal by the rail-lake routes. The next year when the first unit-trains arrived, however, only 1,464,-336 tons of coal were shipped by the rail-lake routes (1,000,000 tons by the unit-train all-rail routes). The estimated division for 1969 was 500,000 tons along the rail-lake routes and 2,200,000 tons along the all-rail routes. In two years, the percentage of coal shipped to Essexville from the Ohio

mines along the rail-lake routes dropped from 100% to approximately 23%. 343 I.C.C, *supra* at 500.

There is no dispute that the all-rail unit-train system not only provides rates lower than those on the rail-lake routes, but also affords service advantages to the utility companies. The all-rail routes can operate year-round, whereas ice conditions on the Great Lakes foreclose lake shipments for approximately four months per year. Year-round service has saved Consumers Power Company about $480,000 annually, money which was previously spent on stockpiling coal for the winter months. In addition, the year-round service has enabled the utility companies and the mine operators to enter into long-term (10 to 15 year) contracts, which in turn allows the mine operators to dedicate the coal from a single mine to a specific unit-train. The result is that a utility company can contract for the coal from one particular mine, thus obtaining coal with a uniform chemical composition and BTU value. 343 I.C.C. 491, 499–500 (1973). In order to utilize the new all-rail system with its service advantages, it was necessary for both the Detroit Edison Company and the Consumers Power Company to spend large sums of money for unit trains and for special handling facilities at their plants. *Id.* at 500–501.

A complaint was filed by Lake Carriers with the Interstate Commerce Commission on March 7, 1967,[4] alleging, among other things:

. . . that the failure of the railroad defendants serving the Lake Erie ports of Ashtabula, Lorain, Sandusky, and Toledo, Ohio, to establish unit-train rates and service on steam coal

---

4. The complainants in the I.C.C. proceeding included all of the plaintiffs in this action plus The Buckeye Steamship Company, Red Arrow Steamship, The Reiss Steamship Company, Tomlinson Fleet Corporation, and Wilson Marine Transit Company. In addition to the railroad companies who intervened in the case at bar, three other railroads were named as defendants in the I.C.C. proceeding: Detroit,

Toledo and Ironton Railroad Company; The Detroit and Toledo Shore Line Railroad Company; and The Ann Arbor Railroad Company. The last two railroads did not appear at the hearings before the administrative law judge and no evidence was introduced concerning their operations. 343 I.C.C. 491, 492, fns. 1 & 2 (1973).

to those ports from certain Ohio mines at a level comparable to the unit-train rates which defendants maintain for all-rail service from those mines to Detroit and Essexville, Mich., and similarly situated points, violates sections 1, 2, 3(1), 3(4), and 4 of the Interstate Commerce Act, and the national transportation policy. 343 I.C.C. 491, 492 (1970) (footnotes omitted).

The complainants requested that unit-train service and rates be prescribed from the mines to the ports pursuant to Sections 6(11)(b), 49 U.S.C.§6 (11)(b); 15(3), 49 U.S.C. § 15(3); and 307(d), 49 U.S.C. § 907(d), of the Interstate Commerce Act (hereinafter Act). Six years later, the Commission issued its Report and Order finding that there was nothing unlawful about the defendant railroads' actions, and that it was neither necessary nor desirable in the public interest to prescribe joint rail-unit-train-lake rates. This Court finds that conclusion to be in error.

## I.

The plaintiffs allege in their complaint in this Court that the Commission erred by not finding that the public interest necessitates the prescription of unit-train service to the Lake Erie ports with either unit-train proportional rates [5] pursuant to Section 6(11)(b) of the Act or joint rail-lake rates to Detroit and Essexville pursuant to Sections 15(3) and 307(d) of the Act. Section 15(3) provides in pertinent part:

> The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest . . . establish through routes, joint classifications, and joint rates, fares, or charges . . . and the terms and conditions under which such through rates shall be operated.

Section 307(d) contains almost identical operative language and is found in

Chapter 12 of the Act, which concerns water carriers.

■ To issue an order under Sections 15(3) or 307(d) of the Act, the Commission need not find, as a precondition, a particular violation of another section of the Act. The language of the sections themselves confers broad powers on the Commission. The defendants have not cited any court decisions to the contrary. In fact, the Commission's Report and Order implies that had it determined that it would have been in the public interest to require unit-train service to the ports with .joint or proportional rates, it could have done so under these sections without first finding that the railroads had violated another specific section of the Act.

■ The broad public interest standard found in Sections 15(3) and 307(d) is not self-defining. Congress, however, provided some guidelines for interpretation when in 1940 it enacted the National Transportation Policy, 49 U.S.C. preceding § 1. The Supreme Court "has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured." *Schaffer Transportation Co. v. United States,* 355 U.S. 83, 87, 78 S.Ct. 173, 176, 2 L.Ed.2d 117 (1957). The National Transportation Policy reads as follows:

> It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act [chapters 1, 8, 12, 13, and 19 of this title], so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of rea-

---

5. Proportional rates are rates "which differ from the corresponding local rates to and from the port and which apply only to traffic which

has been brought to the port or is carried from the port by a common carrier by water." Section 6(11)(b) of the Act.

sonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act [chapters 1, 8, 12, 13, and 19 of this title] shall be administered and enforced with a view to carrying out the above declaration of policy.

Although the Commission, in bringing to bear its accumulated experience in this field of regulation, must be given wide discretion in determining where the public interest lies, this Court must decide whether the exercise of that discretion comports with the pronounced policies of Congress. *Schaffer Transportation Co. v. United States, supra* at 88, 78 S.Ct. 173.

The history of the passage of the National Transportation Policy indicates that one of its primary purposes is to protect water carriers from discrimination against them by the railroads. *I.C.C. v. Inland Waterways Corp.*, 319 U.S. 671, 697–701, 63 S.Ct. 1296, 87 L.Ed. 1655 (1943) (dissenting opinion of J. Black). The Policy was adopted as part of the Transportation Act of 1940 which first placed water carriers under the Commission's jurisdiction. In *Arrow Transportation Co. v. United States*, 176 F.Supp. 411, 416 (N.D.Ala., 1959), *aff'd*, 361 U.S.

353, 80 S.Ct. 406, 4 L.Ed.2d 362 (1960), the district court noted:

> That history [of the passage of the National Transportation Policy] shows that many members of Congress were apprehensive that the Commission would so exercise the regulatory powers conferred by the Transportation Act of 1940 as to prevent water carriers from competing effectively with the railroads. The act was passed only after repeated assurances that these fears were groundless because the Commission would be bound by the provisions of the National Transportation Policy.

■ Thus, one of the important, although not absolute, public interest criteria under Sections 15(3) and 307(d) of the Act is the protection of water carriers. The National Transportation Policy requires "the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages . . . ."

The promotion of competition is another, although again not absolute, consideration in determining the public interest. The National Transportation Policy itself proscribes "unfair or destructive competitive practices . . . ." Section 15a(3) of the Act, 49 U.S.C. § 15a(3),[6] added in 1958 at the urging of the railroads, was designed to allow more intermodal competition. The legislative history of that section is described by Mr. Justice Harlan in *I. C. C. v. New York, N. H. & H. R. R.*, 372 U.S. 744, 753–758, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963). The Commission itself admits in its brief in the instant case that as a matter of law it is required to take

---

6. Section 15a(3) provides: "In a proceeding involving competition between carriers of different modes of transportation subject to this chapter and chapters 8, 12, 13 and 19 of this title, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this chapter and chapters 8, 12, 13 and 19 of this title."

competition into consideration. (Commission's Brief at 33).

■ The facts in this case, as set forth by the Commission, clearly establish that the railroads are engaging in unjust discriminations and unfair competition. Lake Carriers must rely on the railroads to transport coal from the Ohio mines to the Lake Erie ports. The railroads, with complete control over the method of and charge for shipping the coal, subject only to regulation by the Commission, can fix the competitive posture of their own competition. Here, the railroads have employed their monopoly powers to eliminate any effective competition by Lake Carriers which want to utilize unit-train service. If this dispute arose outside the strictures of the Interstate Commerce Act, the actions of the railroads might well amount to violations of the anti-trust laws. *Cf. Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *reh. denied,* 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973); *United States v. Aluminum Co. of America,* 148 F.2d 416 (CA 2, 1945). If the railroads secured and maintained the business of Consumers Power Company and Detroit Edison Company on the basis of better service or lower lawful rates alone, the Lake Carriers could not legally complain. But here, the railroads' refusal to provide some type of unit-train service to the Lake Erie ports, with appropriate rates, constitutes an unfair competitive practice. In the Court's opinion, such a restriction upon competition is clearly contrary to the public interest.

[5] The Commission, nevertheless, would not be required to prescribe unit-train service to the ports if other factors outweighed the foregoing public interest considerations. The Commission sets forth several reasons for its decision in its Report and Order. We shall examine them seriatim.

The Commission states that the diversion of coal traffic from the rail-lake routes to the all-rail routes does not pose a real threat to the Lake Carriers. There is no dispute, however, that the all-rail unit-train service has captured all of the coal shipments to Detroit and most of the coal moving to Essexville. The fact that there is lake carrier traffic moving on the Great Lakes does not negate the fact that the refusal to afford unit-train service to the Lake Carriers prevents those carriers from fairly competing with the railroads for a substantial market. This Court does not believe it is incumbent upon plaintiffs to prove that unlawful discrimination poses a threat of destruction of the Great Lakes fleet in order to be entitled to relief against such acts.

■ The Commission also determined that the traffic lost by the Lake Carriers would not be restored by prescribing unit-train service to the ports, in that the utility companies testified that they would continue to use the all-rail routes over unit-train rail-lake routes. In the Court's opinion, it is unreasonable to assume that the utility companies, being regulated businesses, will not, in the best interests of the companies and their consumers, utilize the mode of transportation affording the best combination of cost and service.

It appears that the utility companies' present position is based, in part, upon the hypothesis that the rates for rail-lake unit-train service would not be competitive with the all-rail unit-train rates. The Commission's Report and Order does contain findings that hypothetical unit-train rail-lake routes would have higher costs than the present all-rail unit-train routes[7] and, therefore, "it

7. As previously noted at Fn. 2, the Commission's findings with regard to relative cost factors are subject to substantial challenge. While the Court does not find it necessary to resolve that issue, it does appear that there may well be omissions from the calculation of the overall costs involved in the all-rail route, including certain costs borne by the utilities which would not be incurred in a rail-lake route, which create a misleading comparison of the total economic factors involved in the two modes of transportation.

would not be in the public interest to foster movements over the less economic routes". 343 I.C.C. 491, 506 (1973). This Court does not perceive, nor has the Commission anywhere explained, how the publishing of the tariff would foster uneconomic movements. Publication of the tariff would not obligate any use of the permitted service. The utility companies could, and based on their statements would, continue to utilize the all-rail routes unless it developed that the rail-lake routes offered a combination of economy and service superior to the present form of transportation.

 This matter of the projection of comparative costs also played another important role in the Commission's determination, in that it was the basis of the finding that the refusal of the railroads to offer unit-train service to the ports was not a destructive competitive practice. The significance placed on the cost comparisons by the Commission is reflected by the fact that it is the first subject considered in the Discussion and Conclusions section of the Report and Order. First, it should be observed that the National Transportation Policy speaks in terms of unfair *or* destructive competition. More importantly, however, the question of which routes have the lower costs is irrelevant to the present case. It is true, to be sure, that Section 15a(3) of the Act, 49 U.S.C. § 15a(3), was enacted by Congress in 1958 to permit the railroads to lower their rates to compete with other modes of transportation. To determine how low a railroad can lawfully reduce its rates, it is necessary to know whether the railroad or the competing common carrier has the cost advantage. *Cf. I. C. C. v. New York, N. H. & H. R. Co.*, 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1965). In the *New Haven* case, *id.* at 759, 83 S.Ct. at 1047, the Supreme Court stated:

> If there is one fact that stands out in bold relief in the legislative history of § 15(a)(3), it is that Congress did not regard the setting of a rate at a particular level as constituting an unfair or destructive competitive practice *simply* because that rate would divert some or all of the traffic from a competing mode. . . . Section 15(a)(3) in other words, made it clear that something more than even hard competition must be shown before a particular rate can be deemed unfair or destructive. (emphasis in the original).

However, Section 15a(3) of the Act and the *New Haven* case are inapposite here. That section and the determination of cost advantage are relevant only in a proceeding to determine "whether a rate is lower than a reasonable minimum rate", Section 15a(3) of the Act. The Lake Carriers are not here complaining that the all-rail unit-train rates are unreasonably low, but rather, that it is unlawful for the railroads to refuse to provide such service at all from the coal mines to the Lake Erie ports. The mere fact that the railroads' all-rail routes may be the low cost routes can not lawfully excuse any and every competitive action they might take. Even if Section 15a(3) were applicable, we think that the railroads' actions do amount to "something more than even hard competition . . . ." They represent the use of monopoly power to foreclose competition.

If the all-rail routes are truly the lower cost system, then the railroads have nothing to fear from the publication of a tariff for unit-train service prescribing proper rates to the ports. The Interstate Commerce Act does not shield water carriers against any form of competition, but it does require that the competition be fair and that any discrimination be just. If the Commission is correct, the result will be that the Lake Carriers will not be able to compete economically, and there will be but one more "paper tariff" in existence. On the other hand, if the Commission is in error, both the Lake Carriers and the

public will be deprived of the benefits that lower cost rail-lake service would afford.

■ The Commission has, in a prior ruling, found that comparative cost advantage was not a controlling factor in determining the issue of destructive competitive practices. In *Georgia Public Service Comm. v. Bush Term. R. Co.*, 310 I.C.C. 225 (1960), the Commission ruled that under the National Transportation Policy the reduction of all-rail rates between points of origin and destination without a reduction in local rates between a point of origin to an intermediate port constituted an unfair or destructive competitive practice by the railroads against water carriers, even though the all-rail system had a cost advantage over the rail-water-rail routes. The Commission, in its Report and Order, attempts to distinguish the *Bush* decision as follows:

> [T]he service in connection with the rail routes [in *Bush*] was conventional carload service, traffic had been moving over the rail-water routes, and the reduced rates had completely diverted all traffic from the rail-water routes resulting in imminent cessation of water service at the port. Here, the unit-train service is wholly different; no unit-train-lake movements have previously occurred although, as indicated, carload rail-lake movements of coal are substantial; and operational difficulties would inhibit unit-train-lake movements. 343 I.C.C. 491, 507 (1973).

The fact that the railroads here have withheld unit-train service to the ports, with rates appropriate for such service, whereas in *Bush* only a reduced rate was withheld, is not a basis of distinction. If it is an unfair practice to refuse to alter the rate structure of a high cost mode of transportation, how can it be said that it is a proper course of action to preempt a projected high cost mode of transportation from entering the arena of competition in the first instance? Although rail-lake movements of coal in general may be substantial, the effect of the railroads' behavior here, as discussed *supra*, has been the diversion of almost all of the considerable coal movements to the Detroit Edison Company in Detroit, Michigan, and to the Consumers Power Company in Essexville, Michigan. Granting that there could be operational difficulties which would inhibit unit-train service to the lake ports, this fact cannot excuse an unfair competitive practice by the railroads. We are again in the situation where the postulation of possible obstacles to efficient and economic unit-train rail-lake service has been relied upon as a basis for refusing to permit the Lake Carriers the opportunity to demonstrate that they can compete with the railroads if the service is afforded and proper rates established. Without the incentive of a tariff for unit-train service and rates to the ports, no capital investment will likely be found to eliminate the operational difficulties described by the Commission.

■ Thus, we conclude that in light of the National Transportation Policy and its legislative history, the Commission's reasons for finding that the public interest would not be served by prescribing unit-train service and rates to the ports does not comport with the pronounced principles of Congress. It is, of course, possible that by reason of the operational difficulties the Lake Carriers will have to overcome and the service advantage which the two utilities claim are afforded by the all-rail route, unit-train service to the lake ports may never become a reality. Lake Carriers may fail to convince the shippers to supply the railroad cars required for a unit-train system. In that case, the Commission will have created "paper rates" which it argues in its brief contravenes a "long standing policy of simplifying and clarifying tariffs and rates." (Commission's Brief at 25). At the oral argument in the case at bar, the Commission stated, in effect, that the policy not to create a paper rate was the only public interest to be served by not

granting the Lake Carriers' request. Although this may be a legitimately important administrative consideration, it cannot overcome the right of the Lake Carriers to vie for coal shippers' business free from any unfair competition by the railroads upon whom they must depend as an integral part of the overall transportation scheme.

## II.

The Lake Carriers also contend that the defendants' refusal to offer unit-train service and rates to the Lake Erie ports constitutes a violation of Section 3(1) of the Act, 49 U.S.C. § 3(1). That section provides:

> It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description.

(emphasis in the original).

There appears to be a preliminary question as to whether this Court is precluded from deciding the merits of this issue because it has not been properly raised. Although none of the defendants alleged such a defense in its answer to the complaint of the Lake Carriers, the railroads did note in their brief that Lake Carriers' arguments concerning Section 3(1) were "somewhat inconsistent" with the fact that the Lake Car-

riers had not raised Section 3(1) in their exceptions to the hearing examiner's recommended Report and Order. (Railroads' Brief at 9).

The original complaint of the complainants before the Commission did allege a violation of Section 3(1) of the Act. While it is true that the Lake Carriers did not take exception to the hearing examiner's recommended finding that the railroads had not violated Section 3(1), an exception to that aspect of the findings was taken by the Council of Lake Erie Ports, which had intervened in the Commission proceedings but is not a party herein. As there was an exception to the proposed finding as regards Section 3(1), the Commission did address itself to the matter with respect to the ports in its final Report and Order.

We are mindful of the general principle enunciated by the Supreme Court that "[a] reviewing court usurps the agency's functions when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Comm'n. v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *see* 3 K. Davis, Administrative Law Treatise § 20.06 (1958). This rule, however, is not inflexible. The Supreme Court has also stated that:

> There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below. See *Blair v. Oesterlein Machine Co.,* 275 U.S. 220, 225.

> Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances

decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice. *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S. Ct. 719, 721, 85 L.Ed. 1037 (1941).

 In the case at bar, no party has raised a formal objection to this Court's consideration of plaintiffs' arguments as to violation of Section 3(1). Neither is the Court without the benefit of the Commission's conclusions and reasoning regarding the merits of the plaintiffs' argument. In its brief the Commission has thoroughly presented the reasons why it concludes that there has been no violation of Section 3(1) with respect to the Lake Carriers. Likewise, the railroads and the Consumers Power Company have also fully discussed this issue. For these reasons and because the issue involves questions of public policy under the regulatory scheme of the Act, we shall proceed to consider the issue on its merits.

In deciding that there has been no Section 3(1) violation the Commission states that the section does not protect a competing carrier, but only applies to a shipper. It relies in that regard on the case of *American Trucking Ass'ns v. Atchison, T. & S. F. Ry.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). Agreeing that *American Trucking* is controlling, the Lake Carriers argue that that case affords them relief here.

 In *American Trucking* the Commission had issued rules requiring railroads which offered trailer-on-flatcar service to the public generally to offer such service to motor and water carriers. The authority of the Commission to order such service was challenged. In its opinion, the Supreme Court noted that the Interstate Commerce Act was originally passed to prevent the railroads, which had a "practical monopoly", from discriminating as to service and rates. *Id.* at 406, 87 S.Ct. 1608. After setting forth the obligations of common

carriers under the Act as provided in Section 1(4), 49 U.S.C. § 1(4); Section 2, 49 U.S.C. § 2; and Section 3(1), 49 U.S.C. § 3(1), the Court stated:

> The Act does not contain any provision expressly exempting traffic offered by carriers by motor vehicle from these broad common-carrier obligations of the railroads. On the contrary, these sections of the Act, read in light of the historic obligations and duties of common carriers and the large number of decisions of the Commission, and of the courts in this country and in England, indicate, presumptively at least, that railroads may not offer the service of transporting trailers for other shippers and deny that service to motor carriers. . . . It is, of course, of no consequence that the Act does not expressly command that the railroads furnish this service to motor carriers. Their obligation as common carriers is comprehensive and exceptions are not to be implied. The fact that the person tendering traffic is a competitor does not permit the railroad to discriminate against him or in his favor. *Id.,* at 407, 87 S.Ct. at 1614 (footnote and citations omitted).

It thus appears that whether the party alleging discrimination on the part of a railroad is the shipper of the goods or the carrier of the goods is not deemed a determinative factor. *Id.* at 408, 87 S. Ct. 1608.

 Given the broad scope of the language of Section 3(1) and the indication by the Supreme Court in *American Trucking* that such language should not be read narrowly in light of the remedial purposes of the Act, we conclude that the plaintiffs are protected by Section 3(1). Like the motor carriers in *American Trucking,* the Lake Carriers want to use, in connection with their own authorized service, a service offered to others by the railroads. There should be no legal difference whether, as in this case, the railroads handle the lading before it is transferred to another mode of trans-

portation, or whether the railroads handle the goods after they have been transported by another carrier as in *American Trucking*. The railroads admit in their brief that it is "conceivable" that the Lake Carriers could be considered shippers within their interpretation of *American Trucking* if Lake Carriers paid the freight charges and were designated as the shippers on the bills of lading. They argue, however, that absent such situation the rationale of *American Trucking* does not apply. (Railroads' Brief at 10). *American Trucking* was not decided on such formal considerations.

It has been suggested in this case that the proviso in Section 3(1) which states that the section does not apply to discrimination against the traffic of another carrier allows the railroads to discriminate against Lake Carriers. That same argument was made and specifically rejected by the Supreme Court in *American Trucking, supra,* at 411–12, 87 S.Ct. 1608.

The Commission and intervening defendants maintain that even assuming that the railroads have procured a preference or advantage over Lake Carriers by refusing to offer unit-train service to the ports, as this Court finds to be the case, there is no violation of Section 3(1) in that such preference or advantage is not "undue or unreasonable" within the meaning of the statute because the transportation conditions of the all-rail unit-train route and the rail leg of the rail-lake route are not substantially the same. It is argued that resolution of the question of whether an "undue or unreasonable" preference or advantage exists is a question of fact for the Commission's determination and not a question of law for this Court's resolution. (I.C.C. Brief at 16; Railroads' Brief at 11; Consumers' Brief at 15). In the Court's opinion, any differences in transportation conditions might justify varying rates, *Cf. I. C. C. v. Mechling*, 330 U.S. 567, 581, 67 S.Ct. 894, 91 L.Ed. 1102 (1947), which certainly would be a matter for the Commission's expertise. But a wholesale refusal to offer comparable service at any rates creates an undue and unreasonable advantage between competing carriers. We, therefore, conclude that the railroads' refusal to provide unit-train service to the ports amounts to a violation of Section 3(1) as a matter of law.

The Commission's Order is vacated, and this proceeding remanded with instructions to the Commission to enter an order prescribing unit-train service to the Lake Erie ports at reasonable joint or proportional rates as prescribed by law.